BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:   (858) 914-2002

*Attorneys for Plaintiffs Norman*
*Wilhoite and Judith Wilhoite*

[Additional Counsel Listed on
Signature Page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORMAN WILHOITE and JUDITH WILHOITE, derivatively on behalf of TuSimple Holdings, Inc., <br><br> Plaintiffs, <br><br> vs. <br><br> XIAODI HOU, MO CHEN, CHENG LU, GUOWEI "CHARLES" CHAO, and HYDRON, INC., <br><br> Defendants, <br><br> and <br><br> TUSIMPLE HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. **'23CV2333 GPC MSB** <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> 1. **Violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.*;** <br> 2. **Violations of the California Uniform Trade Secrets Act, CAL. CIV. CODE § 3426.1 *et seq.*; and** <br> 3. **Civil Conspiracy.** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Verified Shareholder Derivative Complaint

Plaintiffs allege the following based upon personal knowledge with respect to themselves and, with respect to all other matters, the investigation of Counsel. Counsel's investigation included a review and analysis of, *inter alia*: (i) regulatory filings by TuSimple Holdings, Inc. ("TuSimple" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, media statements, and marketing presentations issued and disseminated by defendants; (iii) defendants' statements to analysts and the Company's investors during earnings conference calls, conferences, and interviews; (iv) analyst and industry reports concerning TuSimple; and (v) other industry-specific information related to TuSimple.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is an action seeking to halt the misappropriation of corporate trade secrets, at least some of which have been determined by the United States to be vital to our national security.  The action is brought under the Defend Trade Secrets Act of 2016 (the "DTSA"), as to which this Court has original jurisdiction, as well as a related state law claim arising out of the same common nucleus of operative facts.

2.    Plaintiffs Norman Wilhoite and Judith Wilhoite are stockholders of Nominal Defendant TuSimple Holdings Inc., ("TuSimple" or the "Company"), a public company with substantial operations in California that develops software and related hardware to facilitate the self-driving trucking industry.  As set forth in greater detail herein, TuSimple is the victim of knowing and malicious trade secret misappropriation by defendant Hydron, Inc. ("Hydron") and defendant Mo Chen ("Chen"), facilitated by the other defendants.  Chen is TuSimple's last standing controller after an internecine conflict among TuSimple leadership, as well as the

Verified Shareholder Derivative Complaint

founder of Hydron, a private company that was the recipient of the misappropriated trade secrets.

3.     Not only is TuSimple's misappropriated information a "trade secret" under applicable federal and state law and protected as sensitive intellectual property, but at least some of its trade secrets have also been identified by the United States as sensitive information vital to American national security. The information at issue is the subject of a written National Security Agreement ("NSA") between the United States and TuSimple. The NSA requires TuSimple to protect the information and not to allow its dissemination until and unless that dissemination was reviewed and approved by a specially formed Government Security Committee of the Board of Directors charged under the NSA with protecting the Company's data and chaired by a U.S. director with relevant expertise.

4.     Based upon disclosures recently made by the Company and later made by Hydron, it appears that *after* the Company entered into its NSA with the United States and *after* agreeing to specific measures to protect the integrity of its sensitive trade secrets, Chen, an individual who now holds the majority of the voting power of the Company, wrongfully transferred at least part of the Company's trade secrets to TuSimple's China-based business and a rival company *he* formed to compete in the same space in which the Company operates—Hydron.

5.     Hydron is believed to have ties to the Chinese Communist Party ("CCP") through the backing of the powerful Chinese oligarch Charles Chao, the controller of Sina Corporation ("Sina").

6.     Moreover, Plaintiffs have learned that Hydron has filed papers with the Secretary of State of California within the last few weeks surrendering its license to do business in California and revoking its consent to service in the State for acts that pre-date the surrender of its authority to do business here.

Verified Shareholder Derivative Complaint

7.    At the same time that Hydron—under Chen's direction and through Chao's indirect patronage—was preparing to leave the State of California, TuSimple announced that it would wind down its business in the United States but continue its business in the People's Republic of China ("China").

8.    Company shareholders have filed actions in Delaware state court to address the common law breach of fiduciary duty by the Board of Directors of the Company (the "Board") by, among other things, allowing Chen to misappropriate sensitive intellectual property of the Company for his own use at Hydron (the "Delaware Action").[1]    The Delaware Action does not assert any federal causes of action, whether under the DTSA or otherwise.

9.    In response to the Delaware Action, on March 13, 2023, the Company formed a Special Litigation Committee ("SLC"), a device frequently employed by companies to halt otherwise meritorious derivative litigation during the pendency of a board-led "investigation" of the fiduciary wrongdoing alleged in stockholder suits.  The Company has kept the composition of the SLC a secret.

10.    The parties in the Delaware Action stipulated to, and the court ordered, a stay to allow the SLC to investigate until at least February 29, 2024.

11.    Still, while the SLC "investigates," and the plaintiffs in the Delaware Action sit stayed for approximately ten more weeks, the Company has openly declared that it will exit the United States.  Meanwhile, Hydron—the recipient of TuSimple's misappropriated property—has begun to take steps to leave as well. Whatever the SLC is doing, one thing is clear—*it is not acting to stop Chen and his*

---

[1] *See In re TuSimple Holdings, Inc. Stockholder Litigation*, C.A. No. 2022-1095-PAF (Del. Ch. July 27, 2023) (Public Version of Verified Amended Derivative Complaint).

Verified Shareholder Derivative Complaint

1  *company, Hydron*, from taking steps to put TuSimple's misappropriated trade

2  secrets beyond the reach of U.S. Courts into a foreign jurisdiction where trade

3  secret and other intellectual property protections are regularly unenforced.[2]

4       12.    Plaintiffs thus bring this action derivatively in the name and right of

5  TuSimple to seek emergency equitable relief in several forms, including an

6  injunction and a constructive trust to protect the Company's trade secrets from

7  further misappropriation and from such trade secrets being moved offshore and

8  beyond the effective reach of U.S. Courts.  The action also seeks damages for the

9  misappropriation of the Company's property, including statutory exemplary

10  damages, attorneys' fees, costs and, if appropriate, reasonable license fees

11  pertaining to the misappropriated technology.

12             **II.    JURISDICTION AND VENUE**

13       13.    This Court has subject matter jurisdiction over this action under 28

14  U.S.C. § 1331 because this action arises under the laws of the United States,

15  specifically, the DTSA, 18 U.S.C. § 1836(b)(1) *et seq*., over which this Court has

16  original jurisdiction.

17       14.    This Court has supplemental jurisdiction over the state law civil

18  conspiracy claim asserted herein under 28 U.S.C. § 1367(a) because it is so related

19  to the federal claim that it forms part of the same case or controversy under Article

20  III of the United States Constitution.

21  _____

22       [2] *See, e.g.*, Scott Pelley et al., *Global intelligence leaders warn against
China's technology theft*, CBS NEWS (Oct. 22, 2023), available at

23  https://www.cbsnews.com/news/chinas-technology-theft-major-threat-fbi-head-
warns-60-minutes/; Stu Woo & Daniel Michaels, *China's Newest Weapon to Nab*

24  *Western Technology—Its Courts*, WALL ST. J. (Feb. 20, 2023), available at

25  https://www.wsj.com/articles/u-s-china-technology-disputes-intellectual-property-
europe-e749a72e.

26

27

28

Verified Shareholder Derivative Complaint

15.    Even without the DTSA claim giving it federal question jurisdiction, this Court would still have jurisdiction to hear the state law civil conspiracy claim under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

16.    Venue is proper in this judicial district under 28 U.S.C. § 1391, because: (1) one or more defendants reside in this District; and (2) a substantial part of the events or omissions giving rise to the claims occurred in this District. TuSimple maintains its corporate headquarters in San Diego, California (for now) and certain of the Defendants also reside in California.

17.    Venue is additionally proper in this judicial district under Cal. Corp. Code § 2116, which allows for the enforcement of liability against directors of foreign corporations in the courts of the State of California for, among other things, unauthorized distribution of assets.

### III.    THE PARTIES

18.    Plaintiffs Norman Wilhoite and Judith Wilhoite are shareholders of the Company and have continuously been shareholders at all relevant times.  They are residents and citizens of Hawaii.

19.    Defendant Guowei "Charles" Chao ("Chao") served as TuSimple's Board Chair from April 22, 2019 until his forced resignation in June 2022.  During his tenure, Chao also served as the Chair of the Nominating and Corporate Governance Committee.  At all relevant times, Chao had simultaneously invested in both TuSimple and Hydron.  Chao also serves in leadership positions for several companies other than TuSimple.  For example, Chao currently serves as the Chairman of the board of the directors and CEO of Sina.  In his time at Sina, Chao previously served as President from 2005 to 2013, CFO from 2001 to 2006, Co-COO from 2004 to 2005, Executive Vice President from 2002 to 2003, and Vice President of Finance from 1999 to 2001.  Chao is also currently the chairman of the

Verified Shareholder Derivative Complaint

board of Sina's subsidiary, Weibo Corporation ("Weibo"), a leading social media company in China; a director of NetDragon Websoft Holdings Limited, a Chinese company providing technology for online gaming; and a director of Leju Holdings Ltd., an online-to-offline real estate services provider in China. Upon information and belief, Chao is a national, resident, and citizen of China.

20. Defendant Cheng Lu ("Lu") served as a director of the Company beginning in June 2020. He was President and CEO of the Company for relevant times until his resignation on March 3, 2022. He subsequently returned to his positions in November 2022, which he currently holds. Upon information and belief, Lu is a resident of San Diego, California, and a citizen of California.

21. Defendant Xiaodi Hou ("Hou") was a director of TuSimple from 2015 to 2023. He is also a co-founder of the Company and served as TuSimple's Chief Technology Officer ("CTO") until March 3, 2022, when he was appointed to serve as TuSimple's President, CEO, and Chairperson of the Board. Hou was terminated by the Audit Committee and removed from his position as Chairperson of the Board on October 31, 2022. As detailed herein, however, Hou was subsequently reinstated until he resigned from the Company's Board of Directors on March 9, 2023, in connection with an investigation by the Company's Audit Committee conducted into claims that he was poaching TuSimple employees for work in a new business venture. Hou is a resident of San Diego, California, and a citizen of California.

22. Defendant Mo Chen ("Chen") was at relevant times TuSimple's co-founder, Executive Chairman, and director. Chen previously served as the Company's CEO from 2015 to September 2020. He has served as a director from the Company's founding in 2015 until he resigned his directorship effective June 9, 2022. He served as Executive Chairman of the Board between September 2020 and March 2022. As discussed below, Hou reappointed Chen to the Board on

Verified Shareholder Derivative Complaint

November 10, 2022.  Chen is currently Executive Chairman of the TuSimple Board and the Company's Controlling Stockholder.  He also serves as a member of the Compensation Committee.  Chen is a resident of San Diego, California, and a citizen of Canada.

23.    Until recently surrendering its authority to transact interstate business in California, Defendant Hydron was a Southern California-based Delaware corporation.[3]  While he was a director and Executive Chairman of TuSimple, Chen launched Hydron in March 2021.  Hydron competes with TuSimple in the autonomous trucking space.  It conducts the majority of its business in China.  Hydron is a citizen of both Delaware and California.

24.    Nominal Defendant TuSimple is a Delaware corporation headquartered at all relevant times in San Diego, California with, until recently, operations primarily in the United States and China.[4]  It was founded by Chen and Hou in 2015.  TuSimple develops self-driving technology for the $4 trillion global long-haul freight truck market.  Until recently, TuSimple's stated aim was to use its technology to develop an autonomous freight network ("AFN") that, in turn, would make long haul trucking safer, more reliable, efficient, and environmentally friendly.  TuSimple's principal executive offices are located at 9191 Towne Centre Drive, Suite 600, San Diego, California 92122.  TuSimple is a citizen of both Delaware and California.

25.    The defendants are herein referred to collectively as "Defendants."

---

[3] *TuSimple Co-Founder Mo Chen Launches Hydron, Producing Hydrogen-Powered Autonomous-Ready Freight Trucks*, PR NEWSWIRE (June 10, 2022).

[4] TuSimple also has a small presence in Europe, Hong Kong, and Japan.  *See* TuSimple Holdings, Inc., Annual Report (Form 10-K) (Sept. 7, 2023), Ex. 21.1.

Verified Shareholder Derivative Complaint

26.     Non-Party James Lu ("James Lu") is a director of TuSimple.  He was appointed to the Board on December 7, 2022.  Among other things, James Lu is the founding partner of Joffre Capital, an investment firm in the consumer software, technology, and internet businesses.  He is also the Chairperson of Grindr Inc., the world's largest LGBTQ social dating application.  James Lu was appointed to the Company's Government Security Committee in January 2023 but for undisclosed reasons was subsequently removed. He is a member of the Audit Committee and Chair of the Nominating and Corporate Governance Committee and Compensation Committee.

27.     Non-Party Michael Mosier ("Mosier") is a director of TuSimple.  He was appointed to the Board on December 15, 2022 and is a member of the Government Security Committee.  Mosier previously had served as Acting Director of the U.S. Treasury's Financial Crimes Enforcement Network and had previously been Counselor (Cybersecurity & Emerging Technology) to the Deputy Secretary of the Treasury.

28.     Non-Party Wendy Hayes ("Hayes") was a director of TuSimple.  She was appointed to the Board on December 15, 2022 and was the Chair of the Audit Committee and member of the Nominating and Corporate Governance Committee and Government Security Committee.   She is also a partner at Founders X Ventures, a venture capital firm based in Silicon Valley.  She stepped down from the Board on December 15, 2023.[5]

29.     Non-Party J. Tyler McGaughey ("McGaughey") is a director of TuSimple.  He was appointed to the Board on March 13, 2023 and is the Chair and

---

[5] *See* TuSimple Holdings, Inc., Current Report (Form 8-K) (Dec. 15, 2023) at 3.

Verified Shareholder Derivative Complaint

Security Director for the Government Security Committee. According to TuSimple's website, he is "responsible for overseeing the Company's compliance with federal government legal and regulatory requirements."[6] He is also a partner at the law firm Winston & Strawn LLP.

30.    Non-Party Zhen Tao ("Tao") is a director of TuSimple. She was appointed to the Board on March 13, 2023 and is a member of the Audit Committee. She is a Senior Partner at Third Square Capital Management, an investment firm.

31.    Non-Party Bonnie Yi Zhang ("Zhang") was a member of TuSimple's Board of Directors from September 30, 2020 until June 2022. Zhang currently serves as a member of the Board of Directors and as CFO of Sina. Before joining Sina, Zhang served as CFO of Weibo, a subsidiary of Sina, from 2014 to 2015. Before working at Weibo, Zhang was the CFO of AdChina Ltd., a company operating an integrated internet advertising platform in China, from 2011 to 2014.

## IV.    FACTUAL ALLEGATIONS

### A.    TuSimple Is Founded on the Strength of Its Proprietary Technology

32.    Hou and Chen founded TuSimple in 2015 through a series of predecessor entities to develop autonomous truck solutions in the United States and China. The U.S. business was housed in an entity called TuSimple LLC, formed on August 7, 2015 under the laws of the State of California.

33.    In 2016, Hou and Chen restructured, incorporating TuSimple (Cayman) Limited under the laws of the Cayman Islands to serve as a holding

---

[6]    *Board of Directors*, TuSimple.com, available at https://ir.tusimple.com/governance/board-of-directors/default.aspx (accessed Dec. 12, 2023).

Verified Shareholder Derivative Complaint

company for TuSimple LLC's successor entity, TuSimple, Inc.  TuSimple, Inc. was the "entity through which [TuSimple] currently carr[ies] out substantially all of our operations, and our other international subsidiaries, and all of the assets and operations related to [TuSimple's] autonomous truck solutions business."[7]

34.    In particular, the Company has sought to develop a "fully integrated software and hardware solution" to eventually produce the "world's most advanced" autonomous operation of semi-trucks without the assistance, intervention, or even presence of a human driver.[8]  This is referred to in the industry as "L4 Technology" or "Level 4" autonomy and in the semi-autonomous driving industry refers to the highest amount of autonomy a vehicle can have.

35.    This field is highly competitive, as multiple startups, established players, and vehicle manufacturers compete for technological advances over each other.

36.    In such a dynamic and complex field as semi-autonomous vehicles, TuSimple's ability to protect its proprietary technology from misuse by competitors is instrumental to its success.   TuSimple describes the "[h]allmarks" of its proprietary technology as its "1,000 meter perception range, 35 second planning horizon, high definition ('HD') maps with accuracy within five centimeters, and an integrated L4 autonomous semi-truck design comprising of a fully redundant sensor suite and components."[9]  As of June 30, 2023, the Company held approximately 590 global issued patents that span "the entire autonomous freight ecosystem"

---

[7] TuSimple Holdings, Inc., Registration Statement (Form S/1A) (Apr. 7, 2021) at 27.

[8] *Id.* at 82.

[9] *Id.*

Verified Shareholder Derivative Complaint

along with approximately 1,170 pending patent applications.[10]  Some of the "key elements" of the Company's patents include their "1,000 meter perception system, multi-sensor fusion, prediction model, and planning capabilities."[11]

37.    The Company's proprietary information not only features patents, but also trade secrets and confidential information.  In its 2021 Annual Report, TuSimple stated that it:

> rel[ies] on proprietary information (such as trade secrets, know-how, and confidential information) to protect intellectual property that may not be patentable, or that we believe is best protected by means that do not require public disclosure.  [TuSimple] generally seek[s] to protect this proprietary information by entering into confidentiality agreements, or consulting, services, or employment agreements that contain non-disclosure and non-use provisions with our employees, consultants, contractors, scientific advisors, and third parties.[12]

38.    The core of this U.S.-developed proprietary technology is TuSimple's "full-stack onboard autonomous driving software with industry leading capabilities across perception, planning, and control," along with certain offboard toolchain technologies; its simulation platform; and its data infrastructure.[13]  The source codes for these technologies are trade secrets of TuSimple.[14]  TuSimple's trade

---

[10] TuSimple Holdings, Inc., Annual Report (Form 10-K) (Sept. 7, 2023), at 14.

[11] TuSimple Holdings, Inc., Registration Statement (Form S/1A) (Apr. 7, 2021) at 125.

[12] TuSimple Holdings, Inc., Annual Report (Form 10-K) (Feb. 23, 2022) at 24.

[13] TuSimple Holdings, Inc., Current Report (Form 8-K) (June 27, 2023) at Ex. 99.1.

[14] TuSimple Holdings, Inc., Annual Report (Form 10-K) (Sept. 7, 2023) at 18, 34.

Verified Shareholder Derivative Complaint

secret information also includes the technical data, blueprints, and schematics for implementation of its full-stack autonomous driving technology.

39.    For example, the Company developed and owns the software that it uses for the first-in-the-industry AFN, which provides "a comprehensive, turnkey, autonomous freight solution that supplies users with access to purpose-built L-4 autonomous semi-trucks operating on HD digital mapped routes connecting a nationwide network of terminals."[15]   One such software is a "comprehensive turnkey product" called TuSimple Path.[16]   TuSimple Path, in turn, allows users access to a separate, "on-board autonomous driving software" called TuSimple Connect that provides a "cloud-based autonomous operations oversight system, HD digital route mapping support, and emergency roadside assistance."[17]

40.    TuSimple also owns trade secret information including a vast set of semi-truck-specific driving data that it uses to develop its perception and motion planning technologies.

41.    TuSimple's trade secrets, for purposes of this action, consist of confidential and proprietary information surrounding the Company's autonomous trucking platform, including (among other things) designs, blueprints, schematics, specifications, software, source code, summaries of technical analyses, status reports, technical data and other Company-developed know-how surrounding TuSimple's L4 autonomous driving technology, Autonomous Freight Network, or "AFN," TuSimple Path, and TuSimple Connect.

---

[15] TuSimple Holdings, Inc., Registration Statement (Form S/1A) (Apr. 7, 2021) at 82.

[16] *Id.* at 83.

[17] *Id.*; *see also id.* at 119 (graphic depicting the relationship between TuSimple Path and TuSimple Connect).

Verified Shareholder Derivative Complaint

42.    The Company's research and development has primarily occurred at its locations in the United States, rather than in China.  Relying on the technologies available in the United States, TuSimple historically spent dramatically more on research and development in the United States, spending roughly $105 million in 2020, $215 million in 2021, and $257 million in 2022.  By comparison, TuSimple spent just $27 million, $72 million, and $95 million, respectively, in China and the rest of the Asia Pacific region, purportedly for the purpose of independently developing self-driving technologies.[18]  As set forth in the NSA, TuSimple was not permitted to share sensitive U.S.-developed technologies with its China-based business or any foreign businesses.

43.    TuSimple's proprietary information is critical for purposes of maintaining its competitive standing.  Accordingly, TuSimple entered into proprietary information agreements with its employees, including Chen, Lu, and Hou, which required that TuSimple's trade secret information be held in the strictest confidence and only be used in connection with employment at TuSimple.

44.    As TuSimple disclosed in its 2021 Annual Report, "[i]f any of our trade secrets were to be lawfully obtained or independently developed by a competitor or other third party, we would have no right to prevent them from using that trade secret to compete with us."  Moreover, "[i]f any of our trade secrets were to be disclosed (whether lawfully or otherwise) to or independently developed by a competitor or other third party, it could have a material adverse effect on our business, operating results, and financial condition."[19]  Furthermore, "[f]ailure to

---

[18] TuSimple Holdings, Inc., Annual Report (Form 10-K) (Sept. 7, 2023) at 58.

[19] TuSimple Holdings, Inc., Registration Statement (Form S/1A) (Apr. 7, 2021) at 53-54.

Verified Shareholder Derivative Complaint

adequately protect our intellectual property rights could result in our competitors offering similar products, potentially resulting in the loss of our competitive advantage[.]"[20]

45.    TuSimple made consistent disclosures in subsequent public filings as well.[21]

**B.    TuSimple Reorganizes and Goes Public, But CFIUS Inquires**

46.    In 2017, Sun Dream, Inc. ("Sun Dream") acquired a 20% stake in TuSimple (Cayman) through redeemable convertible preferred stock.[22]  Sun Dream, in turn, is a subsidiary of Sina, a Chinese media conglomerate that is partially backed by the Chinese government[23] and which often functions as an

---

[20] *Id.* at 50.

[21] *See, e.g.*, TuSimple Holdings, Inc., Annual Report (Form 10-K) (Sept. 7, 2023) at 31 ("We rely on a combination of intellectual property rights, such as patents, trademarks, copyrights, and trade secrets (including know-how), in addition to employee and third-party nondisclosure agreements, intellectual property licenses, and other contractual rights, to establish, maintain, protect, and enforce our rights in our technology, proprietary information, and processes. Intellectual property laws and our procedures and restrictions provide only limited protection and any of our intellectual property rights may be challenged, invalidated, circumvented, infringed or misappropriated.  If we fail to protect our intellectual property rights adequately, we may lose an important advantage in the markets in which we compete."); TuSimple Holdings, Inc., Quarterly Report (Form 10-Q) (May 3, 2022) at 41; TuSimple Holdings, Inc., Quarterly Report (Form 10-Q) (Aug. 8, 2022) at 39; TuSimple Holdings, Inc., Quarterly Report (Form 10-Q) (July 17, 2022) at 51.

[22] TuSimple Holdings, Inc., Registration Statement (Form S-1) (Mar. 23, 2021) at 61.

[23] Brenda Goh, Yingzhi Yang & Echo Wang, *Beijing owns stakes in ByteDance, Weibo domestic entities, records show*, Reuters (Aug. 16, 2021), available at https://www.nasdaq.com/articles/beijing-owns-stakes-in-bytedance-weibo-domestic-entities-records-show-2021-08-17.

Verified Shareholder Derivative Complaint

instrumentality of the Chinese Communist Party ("CCP") and its political objectives.[24]

47. Chao controlled, and still controls, both Sina and Sun Dream.[25] Chao has been an executive at Sina for years in various capacities and is CEO of Weibo.

48. Disregarding the connections between Sun Dream and an authoritarian regime overseas, TuSimple's managers continued doing business with Sun Dream for years. For instance, the Company and Sun Dream entered into a convertible loan agreement on June 8, 2020 with a principal of up to $100 million, although only half was actually funded. The Company and Sun Dream subsequently converted the loan into 3,928,937 Series E-1 redeemable convertible preferred stock.[26]

49. Chen and Hou gave Sun Dream two seats on the Board, held by Chao and Zhang.[27] Upon information and belief, this was to honor TuSimple's relationship with Sun Dream.

---

[24] For instance, Sina was one of many Chinese technology companies to institute an internal Communist Party committee. *See, e.g.*, Emily Feng, *Chinese tech giants like Baidu and Sina set up Communist Party committees*, AUSTL. FIN. REV. (Oct. 11, 2017), available at https://www.afr.com/world/asia/chinese-tech-giants-like-baidu-and-sina-set-up-communist-party-committees-20171011-gyyh5u.
The Chinese government also has a storied history of censoring users on Sina's wholly owned social media platform, Weibo, which Sina and Weibo have facilitated. *See, e.g.*, *China Bans Finance Writers From Weibo Over 'Negative' Comments as Stock Market Sinks*, TIME (June 27, 2023), available at https://time.com/6290509/china-finance-writers-weibo-economy/.

[25] TuSimple Holdings, Inc., Registration Statement (Form S/1A) (Apr. 7, 2021) at 155 ("Sun Dream Inc[.] is ultimately controlled by Mr. Charles Chao").

[26] *Id.* at 151.

[27] *See* TuSimple Holdings, Inc., Annual Report (Form 10-K) (Feb. 23, 2022) (describing "current directors of the Company representing Sun Dream Inc.").

Verified Shareholder Derivative Complaint

50.    On February 23, 2021, the Company reorganized into its current corporate structure.  As restructured, TuSimple is a Delaware parent entity acting as a holding company for a wholly owned, California-based subsidiary called TuSimple, Inc., which handles all operations.  The corporate reorganization did not change the Company's principal place of business, which was and has always been San Diego, California, nor did the reorganization alter its day-to-day operations.[28]

51.    The Company's reorganization and general growth were accompanied by an expansion in hiring.  The Company's number of full-time employees expanded significantly between January 1, 2018 from 130 to approximately 1,400 by the end of 2021.[29]

52.    In early 2021, TuSimple geared up to go public through an initial public offering ("IPO").  In its March 23, 2021 prospectus filed with the SEC in connection with the IPO, TuSimple disclosed to its public investors that the Committee on Foreign Investment in the United States ("CFIUS") was investigating a related-party transaction orchestrated by Chen and Hou.  CFIUS is an interagency federal committee that reviews transactions involving foreign investment in the United States that may threaten U.S. national security interests.  In particular,

---

[28] For instance, substantially all the Company's employees have been located in San Diego, California at all relevant times.  *See, e.g.*, TuSimple Holdings, Inc., Registration Statement (Form S/1A) (Apr. 7, 2021) at 131 ("As of December 31, 2020, we had 839 full-time employees. The majority of our employees are based in San Diego, California, with others located in Arizona and Beijing, China."); *see also id.* ("Our corporate headquarters is located in San Diego, California, consisting of approximately 21,000 square feet of office space, primarily for corporate administration as well as research and development.").

[29] TuSimple Holdings, Inc., Annual Report (Form 10-K) (Feb. 23, 2022) at 17.

Verified Shareholder Derivative Complaint

CFIUS inquired into the 2017 transaction by which Sun Dream acquired its 20% stake in TuSimple.[30]

53.    While CFIUS issues lurked beneath the surface, TuSimple completed its IPO and officially listed on the Nasdaq in April 2021, raising over $1 billion in equity based on an $8.5 billion valuation.

54.    The Company took on a dual-class stock structure in which Class A shares traded publicly while Chen and Hou held super-voting stakes through Class B shares.[31]    Through their stakes, after the IPO, Chen and Hou controlled a combined 62.5% of the Company's voting power.

55.    Contemporaneously with the IPO, Chao's Sun Dream sold a portion of its stake and converted the remainder into Class A stock, resulting in Sun Dream holding 13.1% of the Class A shares and 5.8% of total voting power.[32]    Both before and shortly after the IPO, Chao, through Sun Dream, held the largest stake in TuSimple after Chen and Hou.[33]

56.    In TuSimple's IPO Registration Statement, the Company reaffirmed that its "intellectual property is an essential asset of our business" and acknowledged that its "business may be adversely affected if [it is] unable to

---

[30] TuSimple Holdings, Inc., Registration Statement (Form S-1) (Mar. 23, 2021) at 61.

[31] *See* TuSimple Holdings, Inc., Registration Statement (Form S/1A) (Apr. 7, 2021) at 154 (stating that, after the IPO, Chen held 14,367,314 Class A shares and 12,000,000 Class B shares, resulting in a total voting power of 31.4%, while Hou held 13,367,314 Class A shares and 12,000,000 Class B shares for a total voting power of 31.1%). Each owned their stakes through respective intermediaries and trusts. *See id.* at 155.

[32] *Id.*

[33] *See id.* at 154-155.

Verified Shareholder Derivative Complaint

adequately establish, maintain, protect, and enforce our intellectual property and proprietary rights or prevent third parties from making unauthorized use of our technology and other intellectual property rights."[34]

## C.    Chen Founds Hydron Using TuSimple's Misappropriated Trade Secrets

57.    Around the same time as TuSimple's IPO, in late March 2021, Chen clandestinely founded Hydron.  Chen apparently has not minded competing with TuSimple, a company to which he is a fiduciary in various capacities, because Hydron is a rival of TuSimple that also designs, manufactures, and sells autonomous trucks.  As the company's name implies, Hydron's trucks feature hydrogen engines as an alternative to fossil fuels.  Chen did not announce Hydron to the public until over a year later, in June 2022, as discussed further below.

58.    Hydron has significant operations in, and ties to, China, where Chen reportedly spends most of his time.[35]  At relevant times, Hydron was backed by Chen and other Chinese investors, including Chao.  Chen is CEO of Hydron and, upon information and belief, is its controlling stockholder.

59.    Hou, acting in his capacity as a director and CTO of TuSimple, aided Chen and Hydron by expropriating material amounts of TuSimple's intellectual property without authorization—including technical data, blueprints and schematics that would enable Hydron to replicate TuSimple's technology—and transferring such information to Hydron.  Hydron benefitted from these unlawful transfers

---

[34] *Id.* at 27.

[35] Heather Somerville *et al.*, *TuSimple Probed by FBI, SEC over Its Ties to a Chinese Startup*, WALL ST. J. (Oct. 30, 2022), available at https://www.wsj.com/articles/tusimple-probed-by-fbi-sec-over-its-ties-to-a-chinese-startup-11667159325.

Verified Shareholder Derivative Complaint

because it was able to make use of valuable intellectual property and technological advancements that it did not itself develop.

60.    According to Hydron's website, despite its recent formation, it is already "autonomous ready."  Hydron claims that already its trucks are "equipped with a complete set of sensors, computing units and redundant actuators to support SAE Level 4 autonomous operation, allowing fleet owners to operate our trucks nearly continuously stopping only for refueling and preventative maintenance."[36] On information and belief, Hydron's trucks are autonomous ready because of its use of TuSimple's misappropriated trade secret information.

**D.    TuSimple Enters into the NSA with CFIUS and Wrestles with Turnover as its Previously Secret Connection to Hydron Emerges**

61.    Although TuSimple was making progress in commercial terms, the CFIUS investigation had not abated, as the United States remained concerned with the vulnerability of TuSimple's business model to foreign nationals threatening U.S. interests.

62.    On February 18, 2022, TuSimple entered into the NSA with CFIUS and related federal entities as a result of its investigation.  The NSA required certain changes at TuSimple.

63.    The NSA required TuSimple to appoint a Security Officer and a Security Director to the Board, to maintain a Government Security Committee chaired by the Security Director, and to submit regular reports to federal agencies affiliated with CFIUS for monitoring.

64.    The NSA also restricted TuSimple's distribution of data and technology, requiring that it not be shared with TuSimple's China-based businesses and other foreign-controlled companies.

---

[36] *See* https://hydron.com (last visited Dec. 19, 2023).

Verified Shareholder Derivative Complaint

65.    The NSA also required certain personnel changes at TuSimple.  For one, it required Chao and Zhang, who were appointed by Sun Dream, to relinquish their seats by not standing for reelection at the end of June 2022.[37]  Accordingly, Hou—who had been CTO until then—became CEO and Chair of the Board.  Hou replaced Lu as CEO, who had been in that position since September 2020 after joining the Company as CFO in January 2019.

66.    Unsurprisingly, the markets reacted negatively to Hou's sudden appointment to the Board, and TuSimple stock tumbled 20% on the news that he had taken over as CEO.

67.    A few months later, Chen decided it was finally time to announce Hydron to the world.  In June 2022, Hydron publicly announced its business model by issuing a press release describing its goals of building hydrogen-powered, semi-autonomous trucks "equipped with L4 autonomous driving technology."[38]

68.    Because of the similarities in self-driving technology required for both Hydron's and TuSimple's operations, a reporter asked Chen whether TuSimple would be supplying autonomous technology to Hydron.  Chen avoided giving a direct answer, all but admitting that he planned to siphon TuSimple's assets to Hydron (to the extent he was not already doing so).[39]

---

[37] TuSimple Holdings, Inc., Current Report (Form 8-K) (Feb. 18, 2022) at 2.

[38] *TuSimple Co-Founder Mo Chen Launches Hydron, Producing Hydrogen-Powered Autonomous-Ready Freight Trucks*, PR NEWSWIRE (June 10, 2022).

[39] *See* Tom Quimby, *TuSimple co-founder kicks off new fuel cell truck company to help take on supply chain setbacks*, CCJ DIGITAL (June 15, 2022), available at https://www.ccjdigital.com/alternative-power/hydrogen-fuel-cell/article/15293004/tusimple-cofounder-starts-fuel-cell-truck-company#:~:text=Supply (Chen evasively answering, when asked if TuSimple would supply autonomous technology to Hydron, "Hydron's hydrogen powered

Verified Shareholder Derivative Complaint

69.    Also beginning in June 2022, TuSimple's problems with turnover only amplified.    As Chao stepped down from the Board pursuant to the NSA, CFO Patrick Dillon ("Dillon") and General Counsel James Mullen ("Mullen") also left the Company in June and August 2022, respectively.

70.    Upon information and belief, both Dillon and Mullen left because they disapproved of how the Board had mismanaged Company intellectual property assets in relation to Hydron and other matters relating to Hou.    When Mullen and Dillon each raised concerns, they were forced out of the Company.

71.    On August 31, 2022, TuSimple shareholders initiated a federal securities class action in the Southern District of California, alleging violations of federal securities laws for misleading statements made in the Company's public filings, including (among other things) that the Company had omitted mention of TuSimple's related-party transactions with Hydron.[40]

72.    On October 30, 2022, the *Wall Street Journal* reported that the FBI, SEC, and CFIUS were each investigating whether certain Company executives, including Hou, had improperly shared TuSimple's technology and intellectual property with Hydron.[41]    These probes investigated potential securities law

---

autonomous trucks are designed to be software agnostic and can operate on a variety of SAE Level 4 autonomous driving software platforms").

[40] *See Dicker et al. v. TuSimple Holdings, Inc. et al.*, C.A. No. 3:22-cv-01300-BEN-MSB (Aug. 31, 2022) (Original Compl.)*; Dicker*, C.A. No. 3:22-cv-01300-BEN-MSB at Page ID # 1251 (Oct. 2, 2023) (Consol. Compl.).

[41] Heather Somerville, Kate O'Keeffe, & Jang Jie, *TuSimple Probed by FBI, SEC Over Its Ties to a Chinese Startup*, WALL ST. J. (Oct. 30, 2022), available at https://www.wsj.com/articles/tusimple-probed-by-fbi-sec-over-its-ties-to-a-chinese-startup-11667159325?mod=Searchresults_pos1&page=1.

Verified Shareholder Derivative Complaint

violations, for instance, whether (i) TuSimple management had failed to disclose its relationship with Hydron; (ii) TuSimple's intellectual property was improperly transferred to Hydron; (iii) TuSimple had improperly financed Hydron; and (iv) sending valuable technology to an overseas adversary defrauded TuSimple investors.

73.    It turned out Chen was also busy recruiting TuSimple employees at the time, including senior executives, to contribute time and labor to work on Hydron-related matters while being compensated by TuSimple.  Such employees received equity in Hydron while remaining employees at TuSimple.

74.    The TuSimple Board took swift action against Hou, but not against Chen.  On October 31, 2022, TuSimple announced in an SEC disclosure that the Board had terminated Hou as CEO, President, and CTO and removed him from the Board effective immediately.[42]    Hou was replaced by the former EVP of Operations, Ersin Yumer, as interim CEO and President.

75.    The same disclosure also announced that:

> As of the time of this filing, the Company believes that, based on information obtained in connection with an ongoing investigation by the Company's Audit Committee, ***during 2021 Company employees spent paid hours working on matters for Hydron Inc. (f/k/a Turing Auto), a company which the Company believes has significant operations in China***, and that such paid hours had an estimated value of less than $300,000. ***Mr. Mo Chen, one of our co-founders and former Executive Chairman, is a founder, director and chief executive officer of Hydron, and he has an equity interest in the Company of greater than 10%***. This related party transaction was not presented to, or approved by, the Audit Committee as required by the Company's Code of Conduct.[43]

---

[42] TuSimple Holdings, Inc., Current Report (Form 8-K) (Oct. 31, 2022) at 2.

[43] *Id.* (emphasis added).

Verified Shareholder Derivative Complaint

76.    The work that TuSimple employees had spent performing for Hydron in 2021 had not been presented to or approved by either the Board or the Board's Audit Committee, which according to its charter was tasked with "review[ing] and oversee[ing] all transactions between the Company and a related person" and reviewing "actual and potential conflicts of interest" including "corporate opportunities" taken "by insiders, Board members, and corporate officers."[44]

77.    More directly relevant for present purposes, the Company also disclosed that during 2022, it had "***shared confidential information with Hydron and its partners,*** which was not brought to the attention of the Audit Committee and Government Security Committee, and before entering into relevant non-disclosure and other cooperation agreements."[45]

78.    Shortly thereafter, the Company entered into a non-disclosure agreement with Hydron that "covered the information" at issue, but the Company "[did] not know whether Hydron shared, or publicly disclosed, the information before entering into that agreement."[46]

79.    The Company also believed, based on the Audit Committee's ostensibly "ongoing investigation[,]" that the information at issue was "not related to the intangible assets or patents reflected on the Company's balance sheet" and that "the Company has not been able to determine the value, if any, of such information."[47]

---

[44] TuSimple Holdings, Inc., Audit Committee Charter (as of Jan. 27, 2022).

[45] TuSimple Holdings, Inc., Current Report (Form 8-K) (Oct. 31, 2022) at 3 (emphasis added).

[46] *Id.*

[47] *Id.*

Verified Shareholder Derivative Complaint

80.     These actions wrecked the Company's stock price and Wall Street outlook on the Company.   For instance, Bank of America Securities issued an October 31, 2022 report in which it lowered its recommendation to public investors from "Buy" to "Underperform," lowered its Price Objective from $14 per share to $5.50, and explained the downgrade was due in part to the Company's "uncertain direction," and "surprising shift in the boardroom[.]"[48]   Piper Sandler, another investment bank, issued a report the same day downgrading its recommendation from "Overweight" (*i.e.*, "Buy") to "Neutral" (*i.e.*, "Hold"), stating that the stock price had dropped 40% on the news of Hou's removal, that Hou's removal was the "latest in a string of management departures[,]" and that Piper Sandler accordingly cut its price target down from $14 to $4.00 per share.[49]   RBC Capital Markets also issued a report on October 31, 2022 indicating a revised price target of $4 per share.

81.     The Company issued a press release on November 7, 2022, further indicating that it had lost trust in Hou's ability to lead due to "concerns about his lack of candor and transparency with the Board" and that its decision was "made in connection with an ongoing investigation that was initiated by the Board's Audit Committee."[50]

**E.     Chen and Hou Strike Back**

82.     His misconduct brought to light, Hou was down, but not defeated.   Nor

---

[48] Ken Hoexter, Adam Roszkowski, & Nathan Ho, *TuSimple: Lower to Underperform: Fires founder / CEO for cause; PO to $5.50*, BoFA GLOB. RSCH. (Oct. 31, 2022) at 1.

[49] Alexander E. Potter & Ben Johnson, *TuSimple Holdings, Inc. (TSP): Downgrading to Neutral Following Sudden Termination of TSP's CEO*, PIPER SANDLER (Oct. 31, 2022) at 1.

[50] TuSimple Holdings, Inc., Current Report (Form 8-K) (Nov. 7, 2022) at 2.

Verified Shareholder Derivative Complaint

would his ally Chen take kindly to the Board's attempts to limit what he could or could not do with TuSimple's assets or Hydron—even if those limits were prescribed by agreement with the United States through the NSA.

83.    On November 9, 2022, Hou granted Chen an irrevocable proxy over the shares he held through intermediary vehicles, signed a voting agreement with Chen, and agreed to vote his shares as Chen directed.[51]  The result was that Chen could single-handedly wield approximately 59% of the Company's voting power.

84.    The terms of each agreement are particularly solicitous to Chen and his wielding of control well into the foreseeable future.  The irrevocable proxy remains in effect until either (i) the two-year anniversary of the proxy date or (ii) "mutual agreement" between Chen and the intermediary entities through which Hou owns his stock.[52]

85.    On November 10, 2022, Chen used his control over TuSimple to purge almost the entire Board, single-handedly removing directors Brian Buss, Karen C. Francis, Reed Werner, and Michelle Sterling, but leaving his loyalist Hou in place.

86.    By purging the Board, Chen and Hou blatantly violated the NSA, which required the existence of a Government Security Committee.

87.    As the sole remaining member of the Board, and in return for reinstatement, Hou returned the favor to Chen by appointing Chen and Lu to the Board.[53]

88.    The new, three-person Board then removed Yumer as interim CEO and

---

[51] TuSimple Holdings, Inc., Current Report (Form 8-K) (Nov. 9, 2022) at 2; *see also* TuSimple Holdings, Inc., Statement of Beneficial Ownership (Form 13-D) (Nov. 9, 2022) (disclosing irrevocable proxy and voting agreement).

[52] TuSimple Holdings, Inc., Current Report (Form 8-K) (Nov. 9, 2022) at 2.

[53] TuSimple Holdings, Inc., Current Report (Form 8-K) (Nov. 10, 2022) at 2.

Verified Shareholder Derivative Complaint

President of the Company and appointed Lu in his stead.[54]

89.    The new Board also appointed Chen to the Board as Executive Chairman.

90.    The results of the coup were, unsurprisingly, turmoil at the Company. By November 15, 2022, TuSimple had missed its deadline to publicly file a 10-Q, triggering a de-listing process under Nasdaq rules.  KPMG shortly thereafter resigned as TuSimple's principal accounting firm on November 10, 2022.[55]  KPMG explained in a letter to the SEC that it resigned "as a result of recent events *that culminated in the dismissal of [TuSimple's] previous Board of Directors*, including its Audit Committee."[56]

91.    Further, on December 5, 2022, TuSimple was forced to scrap a partnership it had entered in 2020 with Navistar International Corporation ("Navistar"),[57] an original equipment manufacturer that was an important partner for TuSimple.  As a Bank of America analyst report put it, Navistar ended this agreement "primarily due to governance concerns as TuSimple transitioned across 3 different CEOs (Dr. Hou, Dr. Yumer, and now Mr. Lu) over the span of 3 weeks, *and then firing its board of directors*[.]"[58]

---

[54] *Id.*

[55] TuSimple Holdings, Inc., Current Report (Form 8-K) (Nov. 17, 2022) at 2.

[56] TuSimple Holdings, Inc., Current Report (Form 8-K) (Nov. 22, 2022) at 4 (attaching KPMG's letter to the SEC dated November 22, 2022) (emphasis added).

[57] Navistar is a wholly owned subsidiary of TRATON SE, a business with which TuSimple had separate partnerships as well.

[58] Ken Hoexter, Adam Roszkowski, & Nathan Ho, *TuSimple: Commercial plan at risk as Navistar ends relationship, more may cancel; PO to $1.00*, BOFA GLOB. RSCH. (Dec. 6, 2022) at 1 (emphasis added).

Verified Shareholder Derivative Complaint

### F.    Chen and Hou Install a Potemkin Board

92.    To obfuscate the open and notorious coup that Chen and Hou accomplished, the Board jammed up the works with additional directors to strengthen the appearance of neutral Company oversight.

93.    On December 7, 2022, the Board appointed James Lu to the Board, and on December 13 (the first day of James Lu's tenure), appointed him Chair of the Compensation Committee alongside Chen, who was also a member.

94.    On December 15, 2022, the Board appointed Hayes and Mosier to the Board.

95.    Also on December 15, the Board appointed Hayes as Chair and Mosier and Lu as members of the Board's Audit Committee, appointed Lu as the Chair and Hayes as a member of the Board's Nominating and Corporate Governance Committee, and appointed Mosier as Security Director and Chair of the Government Security Committee.

96.    Chen's attempts to paint a picture of an independent Board presiding over a smoothly running company, however, did not fool the market.  On December 20, 2022, after the market closed, news leaked that TuSimple was going to lay off a significant portion of its workforce.  The following day, on December 21, 2022, the Company announced "a broad[] restructuring plan," and confirmed that it was laying off 25% of TuSimple's global workforce.[59]  TuSimple's shares dropped from a close of $1.51 per share on December 20, 2022 to a close of $1.42 per share on December 21, 2022, on high trading volume.

---

[59] Rebecca Bellan, *Self-driving truck company TuSimple to lay off 25% of workforce*, PR NEWSWIRE (Dec. 21, 2022), available at https://techcrunch.com/2022/12/21/self-driving-truck-company-tusimple-to-lay-off-25-of-workforce/.

Verified Shareholder Derivative Complaint

97.   TuSimple management heavily implied that the Company's cuts would be spread evenly across the Company's operations in the United States and China, or that it would fall harder on the Chinese business.  At the same time that management announced layoffs in the United States, the Company stated that it remained "in the process of selling off its Asia-focused businesses[.]"[60]

98.   This framing was consistent with the message that management had expressed months before to investors.  For instance, in a May 3, 2022 earnings call, Hou stated that TuSimple is a "US first, US-centric company."  And in a May 11, 2022 earnings call, then-CFO Patrick Dillon had told investors that the Company was considering a complete sale of the Asia-Pacific business altogether.

**G.    Chen Throws Hou Under the Proverbial Self-Driving Bus**

99.   It is said there is no honor among thieves, but apparently, there is also none in the corporate espionage business either.  Fully powered up with a near-supermajority vote, Chen decided to make Hou, his old-time business partner, into a fall guy.

100.  The Company's woes—especially with the U.S. Government—deepened in early 2023.  Sometime in January 2023, the Company appears to have appointed James Lu and Hayes to the Government Security Committee in an attempt to further legitimize its image.[61]  On February 1, 2023, the *Wall Street Journal* reported that a national security panel had urged the DOJ to consider

---

[60] *Id.*

[61] *TuSimple Adds Independent Directors to Government Security Committee*, PR NEWSWIRE (Jan. 17, 2023), available at https://www.prnewswire.com/news-releases/tusimple-adds-independent-directors-to-government-security-committee-301723837.html.

Verified Shareholder Derivative Complaint

espionage charges against the leadership of TuSimple.[62]  It further reported that the FBI and SEC were investigating whether TuSimple improperly financed and transferred technology to Hydron, the company founded by Chen operating primarily in China.

101.  On March 3, 2023, TuSimple received a Notice of Delisting from Nasdaq for failing to timely file its Form 10-K.[63]

102.  Amid this bad publicity, the Company announced that on March 9, 2023, Hou resigned from the Board because of an internal investigation into claims that he was seeking to get TuSimple employees to resign from the Company and join a new venture that he was planning.[64]

103.  Hou, of course, denied it.  As reported in a March 14, 2023 news article, Hou took his feud public, evidently feeling betrayed by Chen.  Hou publicly denied the basis for his termination and stated that he had resigned over a fundamental disagreement with TuSimple's executive compensation practices and its decision to shift from Level 4 to Level 2 assisted driving.[65]

---

[62] Kate O'Keeffe, Aruna Viswanatha, & Heather Somerville, *Leaders of Self-Driving-Truck Company Face Espionage Concerns Over China Ties*, WALL ST. J. (Feb. 1, 2023), available at https://www.wsj.com/articles/leaders-of-self-driving-truck-company-face-espionage-concerns-over-china-ties-11675255921.

[63] TuSimple Holdings, Inc., Current Report (Form 8-K) (Mar. 3, 2023) at 2.

[64] Rebecca Bellan, *TuSimple co-founder resigns, accused of poaching staff for new venture*, TECHCRUNCH (Mar. 14, 2023), available at https://techcrunch.com/2023/03/13/tusimple-co-founder-resigns-accused-of-poaching-staff-for-new-venture/.

[65] Rebecca Bellan, *TuSimple co-founder blames exit on CEO pay and autonomy downgrade*, TECHCRUNCH (Mar. 14, 2023), available at https://techcrunch.com/2023/03/14/tusimple-co-founder-blames-exit-on-ceo-pay-and-autonomy-downgrade/.

Verified Shareholder Derivative Complaint

104. In a letter dated March 14, 2023, Hou wrote to the TuSimple Board and management that he had resigned over the Company's "business strategy and future direction" and that the "so-called investigation" into his wrongdoing was "retaliation instigated by TuSimple's Chairman and CEO[,]" *i.e.*, his old business partner Chen.[66] Hou also accused Chen and his (other) cronies of "support[ing] the lucrative CEO executive compensation package they sought while simultaneously laying off hundreds of extremely talented employees just before Christmas."[67] Hou also accused management of harassing and threatening employees during the investigation process, which he excoriated as "appalling."[68]

105. To avoid further embarrassment, management tried yet again to whitewash the internal governance problems at TuSimple by appointing ostensibly independent directors. On March 15, 2023, the Company announced McGaughey's and Tao's appointments to the Board.

106. The Board appears to have appointed McGaughey to the Government Security Committee at some time thereafter as well.[69] It also appears that James Lu was at some point removed from the Government Security Committee because the Company subsequently disclosed that its members as of September 2023 were McGaughey, Hayes, and Mosier, with McGaughey succeeding Mosier as Chair and

---

[66] TuSimple Holdings, Inc., Current Report (Form 8-K) (Mar. 16, 2023) at 4 (attaching Hou's letter).

[67] *Id.*

[68] *Id.*

[69] TuSimple Holdings, Inc., Annual Report (Form 10-K) (Sept. 7, 2023) at 109.

Verified Shareholder Derivative Complaint

Security Director.[70]

107.    On March 16, 2023, Chen fired back at Hou.  On behalf of the Board, Chen responded to Hou's letter, describing it as "riddled with post-hoc excuses for your resignation, which are pretextual and false."[71]

108.    Taking up a mantle of hypocrisy, Chen's letter also stated that "the Company will vigorously protect its employees, and its intellectual property[,]" asked Hou to honor the cease and desist letter the Company had sent him, and stated to his fellow co-founder that the Company wished "to finally put the distraction of your tenure at the Company behind us[.]"[72]

109.    Chen also went on to state that the sole reason Hou resigned was "to avoid a requested interview with Company counsel or any potential action by the Audit Committee."[73]

### H.    TuSimple Prepares to Transfer to Hydron and Remove from this Country its U.S. Trade Secrets, as Both Eye an Exit to China

110.    Even as the SLC purports to investigate misconduct, Defendants are routing the intellectual property assets to Hydron—and China—out the back door.

111.    On May 16, 2023, the Company "authorized an additional restructuring plan[,]" *i.e.*, it followed through on layoffs of 300 employees,[74] impacting only TuSimple operations in the United States.[75]  The effects of the

---

[70] *Id.* at 108-09.  It also appears that McGaughey took over Mosier's role as Chair of the Government Security Committee on April 17, 2023.  *See id.* at 41 (stating that McGaughey succeeded Mosier as security director).

[71] TuSimple Holdings, Inc., Current Report (Form 8-K) (Mar. 16, 2023) at 6.

[72] *Id.*

[73] *Id.*

[74] TuSimple Holdings, Inc., Current Report (Form 8-K) (May 18, 2023) at 2.

[75] *Id.* at 5.

Verified Shareholder Derivative Complaint

Company's contraction were not to be spread evenly across TuSimple's global operations, as the Company had indicated back in December 2022.

112.    On May 18, 2023, the Company declared that "it is in the best interest of shareholders to continue owning and operating [the Company's] Asia Pacific subsidiaries and is no longer exploring a transaction."[76]  In other words, TuSimple would shutter its U.S. business and move its research and development efforts to China.

113.    On June 28, 2023, TuSimple publicly stated it was exploring "strategic alternatives" for its U.S. business.[77]

114.    In and of itself, a company's decision to cease operations in one country in order to focus on opportunities elsewhere is not a cause for alarm.  Here, however, the looming threat of federal investigation into Chen's and his companies' misappropriation of assets sensitive to U.S. national security interests appear to be the primary drivers for the Board's sudden about-face.

115.    On September 7, 2023, the Company announced in its delayed 2022 Annual Report that "the Company and certain current and former directors and officers received subpoenas from the SEC requesting the production of Company documents" in response to the investigation "into the related party transaction with Hydron."[78]

---

[76] TuSimple Holdings, Inc., Current Report (Form 8-K) (May 18, 2023) at 2. (attaching TuSimple's Press Release dated May 18, 2023).

[77] *Autonomous firm TuSimple exploring possible U.S. exit*, CCJ DIGITAL (June 30, 2023), available at https://www.ccjdigital.com/equipment-controls/autonomous/article/15541534/autonomous-firm-tusimple-exploring-possible-us-exit.

[78] TuSimple Holdings, Inc., Annual Report (Form 10-K) (Sept. 7, 2023) at 36.  Although federal law requires Annual Reports to be filed 90 days after Fiscal

Verified Shareholder Derivative Complaint

116.   By December 2023, TuSimple had begun packing up shop while federal investigations circled.[79]  The mostly likely explanation for the Company's very public about-face and embrace of an Asia-Pacific home is that Defendants are seeking to (i) relocate to China, (ii) transfer TuSimple's intellectual property and trade secret assets to Hydron and TuSimple's China-based business (both of which are barred under the NSA from receiving TuSimple's trade secret information), and (iii) evade the jurisdictional reach of any U.S. judgment challenging such a move.

117.   By December 4, 2023, the Company announced that it had begun the process of winding down its U.S. operations.  The Company told investors that it was expecting no significant revenue for the year.  The *Wall Street Journal* reported that "TuSimple has stopped hauling freight in its trucks and closed most of its autonomous driving testing and development efforts, according to company statements," and that the Company was "winding down its U.S. business" and "reducing its workforce to about 30 people as it looks for a buyer for its assets that remain in the country."[80]

118.   The same December 4, 2023 *Wall Street Journal* article also added more detail into what federal authorities continued to scrutinize.  In particular, the

---

Year End, TuSimple filed its Annual Report for Fiscal Year End December 31, 2022 roughly five months after the deadline.

[79] *Autonomous Trucking Company TuSimple Begins Winding Down Operations in US*, PYMNTS (Dec. 5, 2023), available at https://www.pymnts.com/shipping/2023/autonomous-trucking-company-tusimple-begins-winding-down-operations-united-states/.

[80] *See* Heather Somerville, *TuSimple Winds Down U.S. Operations as It Looks for Buyer*, WALL ST. J. (Dec. 4, 2023), available at https://www.wsj.com/business/tusimple-winds-down-u-s-operations-as-it-looks-for-buyer-11aa5714.

Verified Shareholder Derivative Complaint

FBI, SEC, and CFIUS had each opened investigations into whether TuSimple had "improperly financed and transferred technology" to none other than Hydron, Chen's side project, which "operates in China and has said it is working to build hydrogen-powered semi trucks to be outfitted with TuSimple autonomous driving systems."[81]

119.    Based on Plaintiffs' investigation, Defendants are also in the process of shuttering *Hydron's* California operation and, upon information and belief, are also attempting to move its assets to China, outside the reach of any U.S. judgment.

120.    On November 13, 2023, Chen signed and filed a Certificate of Surrender on behalf of Hydron with the California Secretary of State's office. The form submitted by Chen stated that Hydron "surrenders its rights and authority to transact intrastate business in the State of California" and that "[t]he corporation revokes its designation of agent for service of process in California."[82]

121.    Meanwhile, the Board's nominally independent directors appear to be jumping ship. On November 15, 2023, Hayes informed the Board that she would not stand for reelection to the Board at the Company's 2023 Annual Meeting of Stockholders held on December 13, 2023.[83] She subsequently stepped down as of December 15, 2023.[84]

---

[81] *Id.*

[82] A copy of the Certificate of Surrender is attached hereto as **Exhibit A**. The form lists Hydron's address as 5405 Morehouse Dr., Suite 320, San Diego, CA 92121.

[83] TuSimple Holdings, Inc., Current Report (Form 8-K) (Nov. 17, 2023).

[84] *See* TuSimple Holdings, Inc., Current Report (Form 8-K) (Dec. 15, 2023) at 3. Hayes was originally appointed to serve "until the Company's 2023 annual meeting of stockholders and until [her] successor is elected and qualified." TuSimple Holdings, Inc., Current Report (Form 8-K) (Dec. 13, 2022) at 2. Upon

Verified Shareholder Derivative Complaint

122.  As a result of Hayes' departure, the two remaining members of the Government Security Committee are Mosier and McGaughey.

123.  These maneuvers are preliminary, but to those paying attention, Chen's and Hydron's overarching plan is clear.  Once the various trade secret assets—whether intellectual property or otherwise—are improperly transferred overseas to China via Hydron or otherwise, they will be beyond the reach of the Courts, TuSimple and any accompanying stockholder oversight.

## V.    DEMAND FUTILITY ALLEGATIONS

124.  Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.  Plaintiffs did not make a demand on the Demand Board to investigate or initiate the derivative claims asserted herein because demand is excused as futile.  Demand is excused because a majority of the six-director Demand Board (comprised of Lu, Chen, James Lu, Mosier, McGaughey, and Tao) (i) faces a substantial likelihood of liability on the claims that are the subject of this Action, (ii) received a material personal benefit from the alleged misconduct that is the subject of this Action, and/or (iii) lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of this Action or who would face a substantial likelihood of liability on the claims that are the subject of this Action.

125.  As detailed above, Chen is a dual director who controls both the Company and Hydron.  Chen personally stands to benefit from the knowing and malicious misappropriation of the Company's trade secrets by Hydron because he is

information and belief, the TuSimple Board does not plan to replace her.  So, her resignation is effective as of December 15, 2023.

Verified Shareholder Derivative Complaint

Hydron's CEO, founder, and controller.

126.   As detailed above, Lu lacks independence from someone who received a material personal benefit, Chen.  Chen is the controlling stockholder of TuSimple and Lu is an inside director, being both CEO and President of TuSimple.[85]  Upon information and belief, Lu derives his principal income from his employment at TuSimple and therefore is not impartial as to Chen's interests.

127.   The remaining directors cannot independently evaluate a demand by operation of the ongoing theft of trade secret assets that Chen and Hydron are currently propounding.  Their lack of independence from Chen—and by extension, Hydron—can be inferred from the fact that they are allowing TuSimple to shutter its U.S.-based operations while the Company's trade secrets are diverted out of the country.

128.   The remaining directors cannot independently evaluate a demand against Chen's interests because Chen is a controlling stockholder who has demonstrated that he will purge any Board that attempts to take action against him or Hydron.  These directors obtained their Board seats after Chen purged the prior Board and are certainly aware that in the face of dissent Chen would purge the Board again.

129.   Furthermore, having appointed the SLC and charged it with final power to investigate and act with respect to the allegations of the Delaware Action, which in large part shares the factual allegations underlying the misappropriation of trade secrets here, the Company has conceded that its Board is incapable of

---

[85] *See In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *35 (Del. Ch. Jan. 25, 2016) ("Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller.").

Verified Shareholder Derivative Complaint

considering a demand as a matter of law.

## VI.    CAUSES OF ACTION
### <u>COUNT I</u>
**Violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq*.**
**(Against Chen, Lu, Hou, and Hydron)**

130.    Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

131.    The Company developed trade secrets in connection with its business; went public in the United States; and trades on the securities exchanges of this country based upon its unique self-driving trade secrets which have been designed to power a new autonomous commercial trucking industry.

132.    TuSimple owns its trade secrets and this action proceeds derivatively on its behalf.

133.    TuSimple took steps to protect its trade secrets through confidentiality agreements with employees and vendors and by otherwise treating its trade secrets as highly confidential.

134.    The United States recognized that the Company's trade secrets are relevant to U.S. national security interests and caused the Company to enter into the NSA with the Company, pursuant to which the Company agreed to take steps to restrict the dissemination of its trade secrets and protect them from misappropriation.

135.    After the Company agreed to the NSA, and in breach of that agreement, the laws of the United States and their duties as directors, Chen and Hou caused the Company to transfer some portion of its trade secrets to Chen's private company, Hydron, for no consideration and without complying with any of the safeguards established by the NSA.  Chen and Hou knew that this was improper.

136.    Chen's and Hou's actions allowing the Company's trade secrets to be transferred to Hydron have been admitted by the Company, as detailed in the

Verified Shareholder Derivative Complaint

1  Company's Form 8-K filed with the SEC on October 31, 2022.

2      137.   Chen's and Hou's actions have also exposed the Company, and

3  themselves, to civil and criminal sanctions by the U.S. Government.

4      138.   Chen and Hou knew that the trade secrets were protected by TuSimple

5  and knew that the transfer of these trade secrets to Hydron was prohibited by

6  Company policy, the terms of their proprietary information agreements, the NSA

7  and their fiduciary duties to TuSimple.  Indeed, Chen has publicly recognized as

8  much in his public spat with Hou, in which he downplayed his own culpability.

9      139.   As the controller and CEO of Hydron, Chen's knowledge can be

10  imputed to Hydron as well.  Thus, Hydron received TuSimple's trade secrets

11  knowing (i) that it had no right to them; (ii) that TuSimple protected them as trade

12  secrets; and (iii) that they were further protected under the NSA.

13      140.   Hydron now uses TuSimple's misappropriated trade secrets in

14  connection with the production of Level 4 autonomous ready trucks competing with

15  autonomous trucks of TuSimple reported to have the same or similar technological

16  capabilities.

17      141.   The Court should take affirmative actions to protect the Company's

18  trade secrets from leaving the jurisdiction and being put beyond the reach of U.S.

19  courts.

20      142.   Given TuSimple's recent announcement that it was closing its

21  operations in the United States and relocating to China, and TuSimple's common

22  control with Hydron—which, as noted above, has surrendered its authority to do

23  business in California—it is reasonably probable that Chen, Lu, and Hydron are in

24  the process of completing the misappropriation of TuSimple's trade secrets by

25  moving them to China and beyond the jurisdiction of the U.S. courts.

26      143.   The Court should enter injunctive relief to prevent (i) Chen, Lu, Hou,

27  and Hydron from moving the trade secrets outside of the United States or

28

Verified Shareholder Derivative Complaint

disseminating them beyond TuSimple; (ii) Hydron from utilizing the trade secrets for any purpose; and (iii) Hydron from disclosing the trade secrets to anyone for any reason. The Court should also establish a constructive trust over TuSimple's trade secrets, including those TuSimple trade secrets wrongfully misappropriated by Hydron, to prevent the transfer and dissipation of the trade secrets.

144.    For purposes of compliance with the DTSA, Plaintiffs state that the business address for Hydron listed on the records of the California Secretary of State is 5405 Morehouse Dr., Suite 320, San Diego, California 92121.

145.    In addition to the foregoing, Chen, Lu, Hou, and Hydron should be held liable for all damages permitted under 18 U.S.C. § 1836(b)(3)(B)-(D) relating to their misappropriation of the Company trade secrets, including damages for actual loss, unjust enrichment, payment of reasonable royalties, and exemplary damages permitted by statute and attorneys' fees, as such misappropriation was willful and malicious.

146.    Absent the Court's intervention, Plaintiffs and the Company are likely to suffer immediate and irreparable harm as the misappropriated trade secrets and the individuals responsible for the misappropriation are likely to be put beyond the jurisdictional reach of the Court.

## COUNT II
### Violations of California Uniform Trade Secrets Act,
CAL. CIV. CODE § 3426.1 *et seq.*
### (Against Chen, Lu, Hou, and Hydron)

147.    Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

148.    The Company developed its trade secrets in connection with its business in San Diego, California, and trades on the securities exchanges of this country based upon its unique self-driving trade secrets which have been designed to power a new autonomous commercial trucking industry.

149.    The Company's trade secrets derive independent economic value from

Verified Shareholder Derivative Complaint

not being generally known to the public or others who can obtain economic value from the disclosure or use of the Company's trade secrets.

150.  TuSimple owns its trade secrets and this action proceeds derivatively on its behalf.

151.  TuSimple took steps to protect its trade secrets through confidentiality agreements with employees and vendors and by otherwise treating its trade secrets as highly confidential.

152.  The United States recognized that the Company's trade secrets are relevant to U.S. national security interests and caused the Company to enter into the NSA with the Company, pursuant to which the Company agreed to take steps to restrict the dissemination of its trade secrets and protect them from misappropriation.

153.  After the Company agreed to the NSA, and in breach of that agreement, the laws of the United States and their duties as directors, Chen and Hou caused the Company to transfer some portion of its trade secrets to Chen's private company, Hydron, for no consideration and without complying with any of the safeguards established by the NSA.  Chen and Hou knew that this was improper.

154.  Chen's and Hou's actions allowing the Company's trade secrets to be transferred to Hydron have been admitted by the Company, as detailed in the Company's Form 8-K filed with the SEC on October 31, 2022.  Indeed, Chen has publicly recognized as much in his public spat with Hou, in which he downplays his own culpability.

155.  Chen's and Hou's actions have also exposed the Company, and themselves, to civil and criminal sanctions by the U.S. Government.

156.  Chen and Hou knew that the trade secrets were protected by TuSimple and knew that the transfer of these trade secrets to Hydron was not permitted by Company policy, their proprietary information agreements, the NSA, or their

Verified Shareholder Derivative Complaint

fiduciary duties.

157.   As the controller and CEO of Hydron, Chen's knowledge can be imputed to Hydron as well.   Thus, Hydron received TuSimple's trade secrets knowing (i) that it had no right to them; (ii) that TuSimple protected them as trade secrets; and (iii) that they were further protected under the NSA.

158.   Hydron now uses TuSimple's misappropriated trade secrets in connection with the production of Level 4 autonomous ready trucks competing with autonomous trucks of TuSimple reported to have the same or similar technological capabilities.   Plaintiffs are entitled to an injunction against the further movement or use of the trade secrets and a constructive trust on the trade secrets and the results of any use of such trade secrets by Hydron.

159.   The misappropriation of the Company's trade secrets was willful and malicious in that Chen, Lu, Hou and Hydron knew that the trade secrets were the property of TuSimple and protected both by common law and the NSA, and yet accepted the Company's trade secrets for its own use and benefit.

160.   Plaintiffs are entitled to the statutory maximum of damages under Cal. Civ. Code § 3426.3, including damages for actual loss, unjust enrichment, payment of reasonable royalties, and exemplary damages with respect to Chen's, Lu's, Hou's and Hydron's misappropriation of the Company's trade secrets as well as attorneys' fees as such misappropriation was willful and malicious.

161.   Absent injunctive relief by the Court, TuSimple will suffer imminent and irreparable harm.

## COUNT III
### Civil Conspiracy
### (Against All Defendants)

162.   Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

163.   In a process spanning multiple parts of TuSimple's short history, all

41

Defendants formed a plan or conspiracy among themselves to deprive TuSimple of its property.

164. Hydron took a step in furtherance of the conspiracy by misappropriating TuSimple's trade secrets, as did Hou.

165. Hydron, Chao, and Chen have benefitted from that misappropriation given that Hydron is owned primarily by, or for the benefit of, Chen. Chao benefited as an additional investor in Hydron.

166. As CEO of TuSimple, Lu additionally supported Chen and Hydron in misappropriating Company assets.

167. TuSimple was harmed by the misappropriation of its property as a result of the civil conspiracy between Defendants.

168. TuSimple is entitled to a return of its property, together with damages flowing from any misappropriation or unauthorized use of that property by Defendants and an injunction prohibiting further use.

## VII.   PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A.    Preliminarily enjoin Defendants from moving the misappropriated trade secrets outside of the jurisdiction of the Court *pendente lite*;

B.    Preliminarily and permanently enjoin Defendants from making any use of the misappropriated trade secrets outside of TuSimple for any purpose;

C.    Establish a constructive trust with respect to the misappropriated trade secrets;

D.    Award compensatory and exemplary damages under Counts I and II hereof with respect to the harm caused to the Company by the misappropriation;

E.    Award attorneys' fees under the relevant statutes and common law;

F.    Award pre- and post-judgment interest; and

G.    Award such other and further relief as the Court may deem appropriate

Verified Shareholder Derivative Complaint

1    in the circumstances.

2    **DEMAND FOR JURY TRIAL**

3    Plaintiffs hereby demand a trial by jury of all issues that are subject to

4    adjudication by a trier of fact.

5    Dated:  December 22, 2023                    Respectfully submitted,

6

7    BOTTINI & BOTTINI, INC.
     Francis A. Bottini, Jr. (SBN 175783)

8    Albert Y. Chang (SBN 296065)
     Aaron P. Arnzen (SBN 218272)

9

10   s/ Francis A. Bottini, Jr.
     Francis A. Bottini, Jr.

11   7817 Ivanhoe Avenue, Suite 102

12   La Jolla, California 92037
     Telephone: (858) 914-2001

13   Facsimile: (858) 914-2002

14   fbottini@bottinilaw.com
     achang@bottinilaw.com

15   aarnzen@bottinilaw.com

16

17   Jeroen van Kwawegen
     Eric Riedel

18   James Janison
     BERNSTEIN LITOWITZ BERGER &

19       GROSSMANN LLP

20   1251 Avenue of the Americas
     New York, New York 10020

21   Telephone: (212) 554-1400

22   jeroen@blbglaw.com
     eric.riedel@blbglaw.com

23   james.janison@blbglaw.com

24

25   Gregory V. Varallo
     BERNSTEIN LITOWITZ BERGER &

26       GROSSMANN LLP

27   500 Delaware Avenue, Suite 901
     Wilmington, Delaware 19801

28

                            43
     Verified Shareholder Derivative Complaint

1

2

Telephone: (302) 364-3600
greg.varallo@blbglaw.com

3    *Attorneys for Plaintiffs Norman Wilhoite and Judith Wilhoite*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

44

Verified Shareholder Derivative Complaint

## VERIFICATION

We, Norman Wilhoite and Judith Wilhoite, verify that we are shareholders of TuSimple Holdings, Inc.  We have reviewed the allegations in this Verified Shareholder Derivative Complaint.  As to those allegations of which we have personal knowledge, we believe them to be true; as to those allegations of which we lack personal knowledge, we rely upon our counsel and counsel's investigation, and believe them to be true.  Having received a copy of the complaint and reviewed it with counsel, we authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December ___20___, 2023.


_Mr. Norman Wilhoite_
_____
                    Norman Wilhoite

_Judith Wilhoite_
_____
                    Judith Wilhoite

# EXHIBIT A

EXHIBIT A

**Secretary of State**
**Certificate of Surrender**
(Foreign Qualified Corporation ONLY)

**SURC**

For Office Use Only

**-FILED-**

File No.: BA20231764672
Date Filed: 11/13/2023

There is **No Fee** for filing a Certificate of Surrender

**Certified Copy Fee (Optional)  –  $5.00**

*Note:* For information about Franchise Tax Board final tax return requirements, go to ftb.ca.gov.

**This Space For Office Use Only**

**1. Corporate Name** (Enter the exact name of the corporation as it is recorded with the California Secretary of State.   Note:  If you registered in California using an assumed name.)

Hydron Inc.

| **2. Secretary of State Entity Number** | **3. Jurisdiction** (State, foreign country or place where this corporation is formed.) |
|---|---|
| C4807833 | DELAWARE |

**4. Mailing Address to mail copies of Legal Service** (Enter the **complete** mailing address where the California Secretary of State may forward copies of any legal documents against the corporation that are served on the Secretary of State intended for the corporation.)

| Mailing Address of Corporation | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| c/o 5405 Morehouse Drive suite 320 | San Diego | CA | 92121 |

**5. Required Statements** (Do not alter the Required Statements – ALL must be true to file this Certificate of Surrender.)

Statements 5(a) – 5(d) are true:

a) The corporation surrenders its rights and authority to transact intrastate business in the State of California.

b) The corporation revokes its designation of agent for service of process in California.

c) The corporation consents to process against it in any action upon any liability or obligation incurred within the State of California prior to the filing of this Certificate of Surrender may be served upon the California Secretary of State.

d) All final returns required under the California Revenue and Taxation Code have.been or will be filed with the California Franchise Tax Board.

**6. Read and Sign Below** (Office or title not required.)

I am a corporate officer and am authorized to sign on behalf of the foreign corporation.

_____
Signature

Mo Terry Chen
_____
Type or Print Name

SURC (REV 03/2022)

2022 California Secretary of State
bizfileOnline.sos.ca.gov

B2224-2543 11/13/2023 5:00 PM Received by California Secretary of State