BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002

BERNSTEIN LITOWITZ BERGER &
   GROSSMANN LLP
Gregory V. Varallo (*pro hac vice*)
500 Delaware Avenue, Suite 901
Wilmington, Delaware 19801
Telephone: (302) 364-3600

*Attorneys for Plaintiffs*
*Norman Wilhoite and Judith Wilhoite*

[Additional counsel listed on signature page.]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORMAN WILHOITE and JUDITH WILHOITE, derivatively on behalf of TUSIMPLE HOLDINGS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> XIAODI HOU, MO CHEN, CHENG LU, GUOWEI "CHARLES" CHAO, and HYDRON, INC., <br><br> Defendants, <br><br> - and - <br><br> TUSIMPLE HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. 23cv2333 BEN (MSB) <br><br> **Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction** <br><br> Date:           March 8, 2024 <br> Time:          10:30 a.m. <br> Courtroom:   5A (Schwartz) <br> Judge:         Hon. Roger T. Benitez |

# Table of Contents

INTRODUCTION ..................................................................................................... 1

FACTS ................................................................................................................... 3

I.     TuSimple's Intellectual Property Supported an $8.5 Billion Valuation .............. 3

II.    Defendants Misappropriated TuSimple's Intellectual Property and Labor to Benefit Hydron ...................................................................................... 5

III.   Documents Call into Question the Candor of TuSimple's Public Disclosures and Declarations Submitted in Connection with This Action .................................................................................................................. 7

IV.   Defendants Chen and Hou Stacked TuSimple's Board of Directors in an Attempt to Avoid Culpability for Their Wrongdoing ................................... 9

V.    Defendants Are Attempting to Pull up Stakes, Abandon TuSimple's U.S. Operations, and Evade This Country's Legal System ................................ 10

ARGUMENT ....................................................................................................... 11

I.     Plaintiffs Are Entitled To Preliminary Injunctive Relief. .................................. 12

     A.    Plaintiffs Are Likely to Succeed on the Merits. ....................................... 12

     B.    Absent Injunctive Relief, TuSimple and Its Public Shareholders Are Likely to Suffer Irreparable Harm ........................... 14

     C.    The Balance of Equities Weighs in Favor of Preliminary Relief .......... 15

     D.    Preliminary Relief Is in the Public Interest ............................................... 16

     E.    The Requested Injunction Is Not Overly Broad ...................................... 17

II.    TuSimple's Refusal to Comply with the TRO's Discovery Requirements Supports a Negative Inference ..................................................... 17

CONCLUSION ................................................................................................... 20

i

# Table of Authorities

## Cases

*Am. Express Travel Related Servs. v. Sidamon-Eristoff,*
    669 F.3d 359 (3d Cir. 2012) ................................................................. 14

*Avery Dennison Corp. v. Kitsonas,*
    118 F. Supp. 2d 848 (S.D. Ohio 2000) ................................................. 16

*Cal.Trucking Ass'n v. Becerra,*
    2019 U.S. Dist. LEXIS 223065 (S.D. Cal. Dec. 31, 2019) .................... 16

*Campbell Soup Co. v. ConAgra, Inc.,*
    977 F.2d 86 (3d Cir. 1992) ................................................................... 15

*Dish Network L.L.C. v. DelVecchio,*
    831 F. Supp. 2d 595 (W.D.N.Y. 2011) ................................................. 16

*ExamWorks v. Todd Baldini,*
    2020 WL 3127928 (E.D. Cal. June 11, 2020) ....................................... 18

*ExamWorks, LLC v. Baldini,*
    835 F. App'x 251 (9th Cir. 2020) ......................................................... 18

*Greengate Fresh, LLLP v. Trinity Fresh Procurement, LLC,*
    2018 WL 6696677 (E.D. Cal. Dec. 20, 2018) ....................................... 17

*Insider Software, Inc., ID Designs, Inc.,*
    2020 U.S. Dist. LEXIS 158435 (N.D. Cal. Aug. 28, 2020) .................... 13

*Jem D Int'l (Michigan), Inc. v. JJD Produce, LLC,*
    2022 WL 1017900 (S.D. Cal. Apr. 5, 2022) .......................................... 17

*Mallet & Co. v. Lacayo,*
    2020 U.S. Dist. LEXIS 218750 (W.D. Penn. Nov. 23, 2020) ...........15, 16

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) ............................................................................. 12

*PUI Audio, Inc. v. Van Den Broek,*
    2021 U.S. Dist. LEXIS 213207 (S.D. Ohio Nov. 4, 2021) ................13, 15

*Residential Funding Corp. v. DeGeorge Fin. Corp.,*
    306 F.3d 99 (2d Cir. 2002) ................................................................... 18

*Samsung Elec. Co. v. Early Bird Sav.,*
    2014 U.S. Dist. LEXIS 10545 (S.D. Cal. Jan. 27, 2014) .............. 13, 15, 16

*Shell Offshore, Inc. v. Greenpeace, Inc.,*
    864 F. Supp. 2d 839 (D. Alaska 2012) ................................................. 16

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................. 12

ii

*XpandOrtho, Inc. v. Zimmer Biomet Holdings, Inc.*,
    2022 U.S. Dist. LEXIS 46698 (S.D. Cal. Mar. 15, 2022) ......................................12, 13

**Rules**

Fed. R. Civ. P. 37 ................................................................................................................18

**Other Authorities**

Matt Burgess,
    *Security News This Week: Don't Panic, but Slack's GitHub Got Hacked*,
    Wired (Jan. 7, 2023) ......................................................................................................14

Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction
Case No. 23cv2333 BEN (MSB)

## INTRODUCTION

Plaintiffs previously presented sufficient evidence to obtain a temporary restraining order ("TRO"), and it is beyond any reasonable dispute that the same evidence supports similar relief through a preliminary injunction. All of this makes sense, given that much of the evidence consists of Defendants' own public admissions. And despite TuSimple's[1] deeply disappointing production of documents under the TRO, Plaintiffs now have additional evidence and an even higher likelihood of success on the merits.   This evidence includes the very emails through which TuSimple personnel transmitted trade secrets to Hydron (Chen's company) and other companies **after** TuSimple entered into the National Security Agreement, but **before** TuSimple entered into a non-disclosure agreement with Hydron.  Even more direct evidence of trade secret misappropriation certainly exists, but TuSimple has thus far refused to even try to obtain evidence from TuSimple China; a motion regarding TuSimple's failure to comply with the TRO is filed concurrently herewith.

To review the bidding, this case arises because Defendants — current and former directors and officers of the San Diego-based autonomous trucking company TuSimple — have unlawfully transferred, and continue to transfer, its valuable trade secrets to another company in the autonomous trucking business with close ties to the Chinese Government.  The beneficiary is a privately held company now operating in China: Hydron, Inc.   Hydron is run by Mo Chen, TuSimple's co-founder and controlling stockholder, and backed by Defendant Charles Chao, a Chinese business mogul and former director of TuSimple.  Unauthorized transfers of trade secrets like this are bad enough for any company's prospects, but because TuSimple designs and builds autonomous trucking technology — which implicates the United States's national security interests — Defendants' theft of trade secrets not only depreciates

---

[1] Terms not defined herein have the same meaning ascribed to them in Plaintiffs' verified complaint.  ECF No. 1.

TuSimple's value but also raises national security concerns.  Indeed, Defendants have caused TuSimple to violate its National Security Agreement with the United States, which federal authorities imposed on TuSimple to prevent the disclosure of certain trade secrets to entities controlled by foreign nationals and entities.

Defendants are now selling TuSimple's fixed assets in the United States, after which Defendants will presumably send the proceeds to China, outside the effective reach of intellectual property protections.  That is alarming, given the pending federal investigations and private litigation targeting Defendants' wrongful conduct.  The only explanation is that Defendants are seeking to (1) relocate to China, (2) transfer TuSimple's intellectual property and trade secret assets to Hydron and other related entities in China (which are barred under the National Security Agreement from receiving TuSimple's trade secret information), and thereby (3) evade the jurisdictional reach of any U.S. judgment.

To ameliorate this situation, on January 23, 2024, the Court issued a TRO, as modified on February 2, 2024.  ECF Nos. 36, 50.  The TRO bars TuSimple from sharing trade secrets with Hydron altogether and with people and entities absent a non-disclosure agreement.  ECF No. 36.  The TRO also required TuSimple to produce documents sufficient (1) to "show the location of TuSimple's trade secrets" and (2) to identify "any proprietary information and/or intellectual property belonging to TuSimple that has been disclosed or transferred to Hydron."  *Id.* at 7.  Based on these two categories of documents, any document reflecting "proprietary information" or "intellectual property" produced by TuSimple in response to the TRO presumably represents information disclosed or transferred to Hydron.  But, in an apparent effort to undermine the TRO and prejudice Plaintiffs' preliminary injunction application, TuSimple has skirted its discovery obligations.  TuSimple refused to search for responsive documents located in China, opaquely redacted information for "confidentiality," and failed to disclose any documents showing the custodial locations

of the Company's trade secrets.  Yet, what little was produced (just 25 documents) when assessed alongside publicly available information, further supports a preliminary injunction.   The record shows that after entering into the National Security Agreement, TuSimple continued sharing trade secrets with Hydron — which it was prohibited from doing — without any confidentiality protections.  The record further shows that, to this day, Hydron remains free to develop and monetize the information misappropriated from TuSimple.

In light of this troubling (and still fluid) series of events, this Court should issue a preliminary injunction designed to preserve the confidentiality of TuSimple's trade secrets, command compliance with the National Security Agreement, and prevent Defendants from disposing of their U.S. TuSimple stock (their only known U.S. assets beyond limited cash) and from syphoning off the proceeds from the Company's liquidation of its U.S. assets.

## FACTS

The facts relevant to this motion are set forth at length in Plaintiffs' brief and related documents supporting their motion for a TRO.  *See generally* ECF 8-1, at 2-12 (Memo of Ps&As); ECF 8-2, Declaration of Albert Y. Chang in Support of Plaintiffs' Motion for a Temporary Restraining Order ("First Chang Decl.").   Plaintiffs incorporate those facts by reference here.   A summary of the relevant factual background and newly discovered evidence follows.

## I.   TuSimple's Intellectual Property Supported an $8.5 Billion Valuation

Founded in San Diego in 2015, TuSimple purports to "develop[] the world's most-advanced self-driving technologies specifically designed for heavy-duty trucks." *See* First Chang Decl. ¶ 4, Ex. 1.  TuSimple worked to develop "L4 Technology" or "Level 4" autonomy, which in industry parlance means the highest amount of autonomy a vehicle can have.  *Id.*  TuSimple claims to have built the world's first Autonomous Freight Network ("AFN") in partnership with shippers, carriers,

railroads, freight brokers, fleet asset owners, and truck hardware partners.  *Id.* ¶ 2b, Ex. 2.  TuSimple has spent an extraordinary amount of time, money, and effort to develop its technologies, with research and development expenses since the beginning of 2015 topping $1 billion.  *Id.* ¶ 7.  Its technologies were the primary basis for its $8.5 billion valuation at the time of its initial public offering in 2021.  *Id.* ¶ 9, Ex. 5.

Much of TuSimple's value depends on its ability to maintain confidentiality over its intellectual property.  The source codes for these technologies are trade secrets, as are the technical data, blueprints, and schematics for implementation of its full-stack autonomous driving technology.  TuSimple's proprietary information was and remains valuable because the Company's competitors do not have access to it.

TuSimple made significant efforts to keep its proprietary information, including trade secrets, secret.  It did so, in part, "by entering into confidentiality agreements, or consulting, services, or employment agreements that contain non-disclosure and non-use provisions with our employees, consultants, contractors, scientific advisors, and third parties," including Defendants Chen, Lu, and Hou.  *Id.* ¶¶ 10c, 11c, Exs. 6, 7.  In its recent production in response to the TRO, ███████████████████████████ █████████████████████████████████████████████████████ ████████████████████.  Declaration of Albert Y. Chang in Support of Plaintiffs' Motion for a Preliminary Injunction ("Third Chang Decl."), Ex. 32.  Troublingly, and in violation of the TRO, TuSimple withheld and redacted ███████████████ ███████  ████████████████████  *See id.*

In addition to protecting the economic value of its trade secrets, confidentiality should have been critically important to TuSimple because its intellectual property implicates this country's national security interests.  After a federal investigation, on February 18, 2022, TuSimple entered into a National Security Agreement ("NSA") with the Committee on Foreign Investment in the United States ("CFIUS").  First Chang Decl., ¶¶ 5c, 5e, 5f, 11-13, Exs. 2, 7–9.  The NSA required that TuSimple

appoint a Security Officer and a Security Director, maintain a Government Security Committee chaired by the Security Director, submit regular reports to federal agencies, and isolate data and technology to prevent them from being shared with TuSimple's Chinese subsidiary or any foreign businesses. *Id.* ¶ 14, Ex. 10.[2]  TuSimple was also obligated to refrain from disseminating its protected information unless and until approval by the Government Security Committee. *Id.*

## II. Defendants Misappropriated TuSimple's Intellectual Property and Labor to Benefit Hydron

Despite the critical importance of maintaining confidentiality over its proprietary intellectual property and honoring its commitments to the United States under the NSA, TuSimple appears to have effectively gifted trade secrets to Hydron. TuSimple's document production demonstrates that, unlike for other OEMs and third parties, Defendants shared trade secrets with Hydron without confidentiality protections.

Defendant Chen clandestinely founded Hydron in March 2021 to compete in the same automated trucking space as TuSimple. *Id.* ¶ 15, Ex. 11.  At that time, Chen served as Executive Chairman of TuSimple's board and his employment agreement obligated him to refrain from "engag[ing] in any other employment, consulting or other business activity (whether full-time or part-time) that would create a conflict of interest with the TuSimple Group." *Id.* ¶¶ 10c, 16, Exs. 6, 12.

Nonetheless, during 2021, Chen and Hou recruited TuSimple employees, including senior executives, to work on Hydron-related matters while being compensated by TuSimple, apparently without seeking the consent of TuSimple's Board.  In October 2022, the Company announced that the Board's Audit Committee had conducted an investigation and found that:

[D]uring 2021 Company employees spent paid hours working on matters

---

[2]  Plaintiffs have requested a copy of the NSA, which TuSimple has not produced.  *See* Third Chang Decl., Ex. 33 (Jan. 25, 2024 email from A. Chang to R. Smith).

for Hydron Inc. (f/k/a Turing Auto), a company which the Company believes has significant operations in China, and that such paid hours had an estimated value of less than $300,000. Mr. Mo Chen, one of our co-founders and former Executive Chairman, is a founder, director and chief executive officer of Hydron, and he has an equity interest in the Company of greater than 10%. **This related party transaction was not presented to, or approved by, the Audit Committee as required by the Company's Code of Conduct**.

*Id.* ¶ 18a, Ex. 14 (emphases added). Defendant Hou was again caught recruiting TuSimple employees to join Hydron around March 2023. *Id.* ¶ 19, Ex. 15.

In connection with co-opting TuSimple's employees for Hydron's benefit, Defendants expropriated TuSimple's intellectual property without authorization — including trade secrets that would enable Hydron to replicate TuSimple's technology. Based on TuSimple's limited search and production of only U.S.-based documents, it is clear that TuSimple disclosed trade secrets to Hydron, including the following:

- ███████████████████████████ (Third Chang Decl., Ex. 34);

- ████████████████████████████████ (*id.*, Ex. 35);

- ████████████████████ (*id.*, Ex. 36); and

- ████████████████████. (*id.*, Ex. 37).

Metadata accompanying these documents indicates that they were created **after** TuSimple entered into the NSA on February 18, 2022 but **before** TuSimple entered into a non-disclosure agreement with Hydron on June 21, 2022.[3] Additionally, ██████ ████████████████████████████████████████████████████ ██████████████████████ — months before TuSimple and Hydron entered into a non-disclosure agreement. *Id.* Exs. 38, 44, 45.[4] ████ ████████████████████████████████████████████████████ █████████████████ — none of which had non-

---

[3] Third Chang Decl., Exs. 34–37.

[4] Once a protective order is entered in this action, Plaintiffs will obtain a certified translation of these documents, which they will provide to the Court.

disclosure agreements with TuSimple when the information was shared.  *Id.* Ex. 32.

When TuSimple disclosed that it had paid employees to work for Hydron (as discussed above), it also reported that Defendants caused the Company to share with Hydron and its partners secret information — which presumably includes the trade secrets referenced above and evidenced in TuSimple's document production — without the knowledge of the Audit Committee and Government Security Committee, and "before entering into relevant non-disclosure and other cooperation agreements." First Chang Decl.*, ¶* 18b, Ex. 14.  After these trade secrets were disclosed, TuSimple announced that it had "entered into a non-disclosure agreement with Hydron and its partners that covered the information." *Id.*  The Company also disclosed that it "does not know whether Hydron shared, or publicly disclosed, the information before entering into that agreement."  *Id.*   Although TuSimple found the disclosed confidential information important enough to require it to enter into a non-disclosure agreement with Hydron, it disclaimed any value in the information shared, stating that it "has not been able to determine the value, if any, of such information."  *Id.*

The revelations about TuSimple's disclosures to Hydron sparked investigations by the FBI, SEC, and CFIUS that remain ongoing.  *Id.* ¶¶ 10b, 21, Exs. 6, 17.

Hydron's website advertises that it uses the confidential technology developed and shared by TuSimple.  Hydron's website unequivocally states that its trucks are "**equipped with a complete set of sensors, computing units and redundant actuators to support SAE Level 4 autonomous operations**[.]"  Third Chang Decl., Ex. 39.  TuSimple's production demonstrates that this does not refer to TuSimple technology licensed by Hydron, because the production does not include a single license with any truck manufacturer or other third party.

## III. Documents Call into Question the Candor of TuSimple's Public Disclosures and Declarations Submitted in Connection with This Action

TuSimple's production further reveals serious shortcomings concerning its non-disclosure agreement with Hydron and related public disclosures.  In response to

7

1   the TRO, ███████████████████████████████████████████████████

2   ███████████████████████████████████████████████████████████████

3   ███████████████████████████████████████████████████████████████

4   ██████████████████████████████████████. Third Chang Decl., Ex. 40 (██████

5   ███████████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████████████

12  ████████████████████████

13  █████████████████████████████████████ calls into question the

14  accuracy of the declaration submitted by TuSimple's CEO, Defendant Cheng Lu.  Lu

15  declared that the "2022 non-disclosure agreement with Hydron ... cover[ed]

16  information shared that year…. That statement remains true today."  ECF No. 28-1,

17  ¶ 28.  The literal terms of the non-disclosure agreement with Hydron, ████████████

18  ███████████████████████████████████████████████████████████████

19  ████████████████████████, render this sworn statement downright misleading.

20  Indeed, as discussed above, the Company's document production indicates that

21  TuSimple appears to have shared trade secrets with Hydron *before* entering into the

22  non-disclosure agreement on June 21, 2022.

23       Additionally, the documents raise serious questions concerning the declaration

24  of the Company's Security Officer, Jing Zhu, about TuSimple's efforts to protect the

25  confidentiality of its trade secrets.  Zhu's affidavit implies that TuSimple's proprietary

26  information was stored in a small handful of so-called "Covered IP Repositories"

27  limited to "Github, Confluence spaces that include Covered IP, Arena, 3DX, and

28



8

LucidChart."  ECF No. 28-2, ¶¶ 6, 9.  But TuSimple's production reveals a much different picture.  ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.  Third Chang Decl., Ex. 41.[5]  TuSimple fails to disclose who had access to these trade secret repositories, or whether Defendants, or employees of TuSimple China, or Hydron had access to them.  *Id.*  Further shrouding in secrecy whether access to TuSimple's trade secrets extended to employees at TuSimple China and Hydron, the Company withheld by redacting as "confidential" the names of two of the trade secret repositories.

## IV.  Defendants Chen and Hou Stacked TuSimple's Board of Directors in an Attempt to Avoid Culpability for Their Wrongdoing

Based on the Audit Committee's finding that Defendant Hou had arranged for TuSimple employees to spend paid hours working for Hydron, and that Hou exhibited a "lack of candor and transparency with the Board," TuSimple's board terminated Hou from his positions as CEO, president, CTO, and Board member as of October 30, 2022.  First Chang Decl., ¶ 22, Ex. 18.

In response, Chen and Hou joined forces to fire the independent directors and get Hou back on the Board.  In particular, Hou and Chen agreed to combine their collective 59% voting power over TuSimple to purge the entire board (except for Chen), reinstate Hou to the Board, and appoint Chen as Executive Chairman.  *Id.* ¶ 23, Ex. 19.  This purge blatantly violated the National Security Agreement, which required TuSimple to maintain a Government Security Committee.  After wresting control of TuSimple, Chen and Hou installed a Potemkin board to mask the source of real power at the Company.  *Id.* ¶¶ 24, 26, Exs. 20–21.

---

[5] The redactions, which are not authorized by the TRO, are also dubious.  For example, the Zhu dec ████████████████████████████████████ does not appear on ████████████████████████████████████████████ *Compare* ECF 28- ████████████████████████████████████████████████ ████████████████████████████

9

## V.      Defendants Are Attempting to Pull up Stakes, Abandon TuSimple's U.S. Operations, and Evade This Country's Legal System

Defendants are in the process of removing from the U.S. the Company's trade secrets and other technologies subject to export controls in a transparent attempt to avoid the jurisdictional reach of American courts.   On December 4, 2023, the Company announced it was "winding down the Company's U.S. operations, including through sales of U.S. assets, and assisting with the Company's strategic shift to the Asia-Pacific region."   *Id.* ¶ 30, Ex. 25.   While winding down the Company's U.S. business, Defendant Cheng Lu reportedly told TuSimple employees in San Diego that he wanted to ship computer processers with potential military application to China in violation of U.S. export-control regulations.   Third Chang Decl., Ex. 43, at 2, 4.   To avoid these restrictions and attempt to evade detection, Lu had his assistant send an email to a TuSimple executive in China indicating that the chips would be shipped to an Australian shell company controlled by Lu and TuSimple's controller — Defendant Chen — where Defendants would "fetch it next month."   *Id.* at 4–5.   Authorities intercepted the shipment before it left the United States and the Commerce Department commenced an investigation.   *Id.* at 5.   Shortly after learning of this investigation, TuSimple announced that it was delisting its stock apparently to avoid its public disclosure requirements.   *Id.* at 2.   Yesterday, February 8, 2024, TuSimple announced that it had suspended its duty to file reports with the SEC.   *Id.*, Ex. 46.

Meanwhile, Defendants are in the process of shuttering Hydron's California operations, leaving its remaining business and assets in China as well.   On November 13, 2023, Chen signed and filed a Certificate of Surrender on behalf of Hydron with the California Secretary of State's office.   *See* Reply Declaration of Albert Y. Chang in Further Support of Motion for Temporary Restraining Order ("Second Chang Decl."), ¶ 31, Ex. 26.   The form submitted by Chen stated that Hydron "surrenders its rights and authority to transact intrastate business in the State of California."   *Id.*

10

# ARGUMENT

The evidence establishes Defendants' misappropriation of TuSimple's trade secrets, the Company's inadequate trade secret protections, and efforts to abandon the U.S. in favor of China. These establish the need for preliminary injunctive relief. Without such relief, Defendants' actions will irreparably harm the Company and its minority stockholders by allowing Defendants to steal the Company's key intellectual property for their own benefit and that of Hydron, insulated from the reach of U.S. courts. Plaintiffs seek a preliminary injunction replicating the protections of the TRO, enjoining Hydron, TuSimple, and the other Defendants, and all those acting in concert with any of them or with actual notice of the Court's Order, from:

    a. Violating the National Security Agreement between TuSimple and CFIUS.

    b. Selling, transferring, or disclosing TuSimple trade secrets from the United States to people or entities outside the United States, including TuSimple's China-based businesses.

    c. Selling, transferring, or disclosing TuSimple trade secrets from the United States to Hydron, Inc.

    d. Transferring outside of the United States any proceeds obtained from the sale, transfer, or disclosure of TuSimple's trade secrets.

    e. Transferring outside of the United States any proceeds obtained from the sale, transfer, or disclosure of TuSimple's assets other than trade secrets.

    f. Selling, transferring, or disclosing TuSimple trade secrets located outside the United States to Hydron, Inc., or any other entity controlled by or under common control with Mo Chen, his family members, affiliates, or associates.

    g. Selling, transferring, or disclosing TuSimple trade secrets to any person or entity except pursuant to a commercially reasonable non-disclosure agreement.

In addition, Plaintiffs seek to enjoin Defendants from selling, transferring, or encumbering their TuSimple stock.

I.      **Plaintiffs Are Entitled To Preliminary Injunctive Relief**

To obtain a preliminary injunction, a plaintiff must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in their favor; and (4) their requested relief is in the public interest.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Plaintiffs here have met these hurdles.

A.      **Plaintiffs Are Likely to Succeed on the Merits**

To show a likelihood of success, Plaintiffs must present "serious questions" going to the merits of their claims. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  As this Court held in *XpandOrtho, Inc. v. Zimmer Biomet Holdings, Inc.*, "[t]o plead a claim for misappropriation of trade secrets" under the DTSA and the CUTSA, a plaintiff need only allege "(1) [the] existence of a trade secret and (2) subsequent misappropriation of that trade secret."  2022 U.S. Dist. LEXIS 46698, at **33–34 (S.D. Cal. Mar. 15, 2022) (Benitez, J.).  Here, Plaintiffs have proffered evidence to support both elements, clearing the "serious questions" threshold.

First, Plaintiffs' Complaint and this motion detail the trade secrets in question, consisting of software and other non-public scientific, technical, or engineering information relating to TuSimple's L4 and AFN technologies.  TuSimple's own SEC filings state that it has developed "the world's most advanced Level 4 ('L4') driver-out autonomous semi-truck technology" (First Chang Decl., ¶ 5a, Ex. 2 at 1), and that it has spent over $1 billion developing and safeguarding such technology (*id.* ¶ 7).  Indeed, TuSimple has conceded that the Complaint sufficiently describes the "trade secrets" at issue here.  In its January 25, 2024 submission regarding the TRO, TuSimple sought to use paragraph 41 of the Complaint to define the term "trade secret" as used in the TRO.  ECF No. 37 at 1–2; *see also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("judicial estoppel …prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase").

12

Plaintiffs also sufficiently demonstrate the secret nature of TuSimple's technology through evidence of (1) TuSimple's measures to keep its proprietary information secret, including its use of approximately 665 non-disclosure agreements (*id.* ¶¶ 10c, 11c, Ex. 6 at 10.17–10.19, Ex. 7 at 24; Third Chang Decl., Ex. 32); (2) TuSimple's admissions of the importance of protecting its "intellectual property rights" (First Chang Decl., ¶ 11a–b, Ex. 7 at 22, 24); and (3) the national security interest identified by CFIUS (*id.* ¶ 14, Ex. 10 at 1). Just like the trade secrets in *XpandOrtho*, these facts support Plaintiffs' claim for misappropriation of trade secrets. *See* 2022 U.S. Dist. LEXIS 46698, at *37 (finding "the existence of trade secrets" based on allegations of the efforts taken to maintain the secrecy of [plaintiff's] trade secrets").

Second, evidence, including TuSimple's own admissions (First Chang Decl., ¶ 22, Ex. 18), demonstrates that Defendants improperly shared TuSimple's trade secrets with Hydron — which is owned by Chen and Chao (*id.* ¶ 15, Ex. 11) — without requiring a confidentiality agreement, and that Hydron benefited from TuSimple's trade secrets, as well as its labor (*supra* Facts § II). Documents produced by TuSimple show that (1) Hydron obtained TuSimple's trade secrets and (2) any such information obtained before June 21, 2022 was and is not subject to any confidentiality restrictions. *Id.* As in *XpandOrtho*, such evidence is more than sufficient to state a claim under the DTSA and CUTSA. *See* 2022 U.S. Dist. LEXIS 46698, at **38–39. Where, as here, the evidence shows a likelihood of success on the merits, this Court has granted preliminary relief to enjoin further violations of intellectual property laws. *See Samsung Elec. Co. v. Early Bird Sav.*, 2014 U.S. Dist. LEXIS 10545, at **7–8 (S.D. Cal. Jan. 27, 2014) (Benitez, J.) (issuing a TRO because plaintiff demonstrated a likelihood of success of its trademark-infringement claim by showing consumer confusion).[6]

---

[6] *See also, e.g., PUI Audio, Inc. v. Van Den Broek*, 2021 U.S. Dist. LEXIS 213207, at *25 (S.D. Ohio Nov. 4, 2021) (evidence showing "a threat of misappropriation [of trade secrets]" is sufficient to justify an injunction); *Insider Software, Inc., ID Designs, Inc.*, 2020 U.S. Dist. LEXIS 158435, at *9 (N.D. Cal. Aug. 28, 2020) (finding likelihood of success on the merits where plaintiff showed unauthorized access to trade secrets).

13

Further, the limited information TuSimple disclosed about its trade secret repositories shows that ████████████████████████ ████████████████████████ — which are much broader than what TuSimple previously disclosed to this Court in a sworn declaration (*see* ECF 28-2 at ¶ 9) — include ████████████████████████████ ████████.[7]  Although the Zhu declaration claims that certain of those repositories — *i.e.*, Github, Confluence spaces that include Covered IP, Arena, 3DX, and LucidChart — are only accessible by the unidentified "administrators of those repositories," (*see* ECF 28-2 at ¶ 9), the Company's document production ████████████████████ ████████████████████████████████████████ ████████████████████████████.  Third Chang Decl. Ex. 41.  This evidence is sufficient to show that Plaintiffs have raised "serious questions" on the merits demonstrating a probability of success on their claim for misappropriation of trade secrets.  *Alliance for the Wild Rockies*, 632 F.3d at 1135.[8]

## B.  Absent Injunctive Relief, TuSimple and Its Public Shareholders Are Likely to Suffer Irreparable Harm

The evidence of irreparable harm to Plaintiffs and TuSimple's public shareholders is clear and mounting.  The December 2023 announcements of the simultaneous winding down of TuSimple's and Hydron's U.S. operations support a finding of an imminent transfer of TuSimple's remaining trade secret information.  Second Chang Decl. ¶¶ 30, 31, Ex. 25 at 3, 26 at 1.

In addition, TuSimple stockholders will be irreparably harmed by Defendants

---

[7] *See* Matt Burgess, *Security News This Week: Don't Panic, but Slack's GitHub Got Hacked*, WIRED (Jan. 7, 2023) ("On December 31 … Slack posted a new security update to its blog. In the post, the company says it detected a 'security issue involving unauthorized access to a subset of Slack's code repositories.' Starting on December 27, it found that an unknown threat actor had stolen Slack employee tokens and used them to access its external GitHub repository and download some of the company's code.") (available at https://www.wired.com/story/slack-data-breach-security-news-roundup/) (last visited Feb. 9, 2024).

[8] *Accord Am. Express Travel Related Servs. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) ("a reasonable probability of success on the merits" is sufficient).

14

flaunting their obligations under the National Security Agreement to prohibit the disclosure of trade secrets without adequate confidentiality protections.  Despite entry into the National Security Agreement in February 2022, which required that TuSimple isolate its data and technology to prevent them from being shared with Hydron and TuSimple's Chinese subsidiaries, the documents now in hand ███████████████.  For example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  Third Chang Decl., Exs. 38, 44, 45.  Defendants have apparently ignored the NSA, have recently delisted the Company's stock, and are gearing up to move to China in a blatant attempt to avoid regulatory scrutiny and leave the Company's public stockholders with effectively illiquid, worthless stock and no way to share in the future proceeds derived from commercializing TuSimple's trade secrets.  This warrants preliminary injunctive relief to prevent Defendants from leaving Plaintiffs and TuSimple's other minority stockholders with worthless shares.  *See* ECF No. 29.  Defendants, by contrast, are indifferent between which of TuSimple and Hydron hold the relevant trade secrets because they have ownership interests in both.  *Samsung,* 2014 U.S. Dist. LEXIS 10545, at *8 (irreparable harm demonstrated where the company "ha[d] invested considerable time and money in developing its products," and that "its investment [was] jeopardized by [defendants'] products.").[9]

## C.   The Balance of Equities Weighs in Favor of Preliminary Relief

Plaintiffs have shown that a preliminary injunction would prevent Defendants from committing further misappropriation of TuSimple's trade secrets and securing

---

[9] *See also, e.g., PUI Audio,* 2021 U.S. Dist. LEXIS 213207, at *26 ("the loss of fair competition" constitutes irreparable harm); *Mallet & Co. v. Lacayo,* 2020 U.S. Dist. LEXIS 218750, at *24 (W.D. Penn. Nov. 23, 2020) ("'disclos[ure] [of trade secrets] to a competitor will almost certainly show immediate irreparable harm'") (quoting *Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 92–93 (3d Cir. 1992)).

15

the benefits of their prior misappropriation.  Chang Decl. ¶¶ 11b, 17b, Exs. 7, 14.  Just like the plaintiffs in *California Trucking Association v. Becerra*, Plaintiffs here have demonstrated the "lack [of] any other adequate legal remedy to preserve the status quo over the brief period of time before the Court can address their preliminary injunction motion."  2019 U.S. Dist. LEXIS 223065, at *6 (S.D. Cal. Dec. 31, 2019) (Benitez, J.).

All told, TuSimple does not — and cannot — deny that the preliminary injunction sought by Plaintiffs would only prevent the illegal transfer of trade secrets. As this Court found in *Samsung*, the fact that Plaintiffs seek to halt illegal conduct weighs in favor of granting preliminary relief:

> [Plaintiff] has demonstrated that the balancing of harms favors maintenance of the TRO.  *Defendants would only be prevented from engaging in an activity which is likely to constitute infringement* and allows them to profit at the expense of [plaintiff] and the public.

2014 U.S. Dist. LEXIS 10545, at **8–9.[10]  Because the preliminary injunction sought here would prevent Defendants from engaging in further violations of law and the National Security Agreement and is related to the Company's interest in recovering damages from Defendants, the balance of equities weighs in favor of granting a preliminary injunction.

### D.    Preliminary Relief Is in the Public Interest

As this Court held in *Samsung*, an injunction preventing further violation of intellectual-property laws is "in the public interest."  *See* 2014 U.S. Dist. LEXIS 10545, at *9.  This is exactly what Plaintiffs seek.  Consideration of the public interest factor thus favors the issuance of a preliminary injunction here.  *See id.*[11]

---

[10] *See also, e.g., Shell Offshore, Inc. v. Greenpeace, Inc.*, 864 F. Supp. 2d 839, 853 (D. Alaska 2012) (balance of equities weighs in favor of curbing "illegal and tortious conduct"); *Dish Network L.L.C. v. DelVecchio*, 831 F. Supp. 2d 595, 602 (W.D.N.Y. 2011) (same); *Mallet & Co.*, 2020 U.S. Dist. LEXIS 218750, at *31 (same).

[11] *See also, e.g., Mallet & Co.*, 2020 U.S. Dist. LEXIS 218750, at *32 ("[t]he public interest is served by stopping defendants from using … confidential and trade secret information"); *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 855 (S.D. Ohio 2000) (same).

16

### E.     The Requested Injunction Is Not Overly Broad

TuSimple has already conceded the harmlessness of the requested preliminary injunction barring the Company from sharing its trade secrets with Hydron and prohibiting the disclosure of trade secret information absent a non-disclosure agreement.  The existing TRO is narrowly tailored to allow the Company to engage in normal course activities.

There is also a risk that Defendants will sell their stock and dissipate TuSimple's cash by sending it to China, outside the jurisdiction of U.S. courts, leaving stockholders without the ability to recover on their claims. Thus, freezing Defendants' ability to dispose of their TuSimple stock is required to ensure that TuSimple will be able to recover damages from Defendants.  *See, e.g., Greengate Fresh, LLLP v. Trinity Fresh Procurement, LLC*, 2018 WL 6696677, at **3–4 (E.D. Cal. Dec. 20, 2018); *Jem D Int'l (Michigan), Inc. v. JJD Produce, LLC*, 2022 WL 1017900, at *4 (S.D. Cal. Apr. 5, 2022); *see also In re Focus Media Inc.*, 387 F.3d 1077, 1085 (9th Cir. 2004) (temporary freeze orders may be granted where there is a "nexus between the assets sought to be frozen . . . and the ultimate relief requested in the lawsuit") (internal quotation marks omitted).   Similarly, freezing TuSimple's cash is required to prevent potential dissipation of the Company's assets located in the United States.

## II.     TuSimple's Refusal to Comply with the TRO's Discovery Requirements Supports a Negative Inference

As discussed above and in Plaintiffs' motion for compliance with the TRO, filed contemporaneously herewith, deficiencies in TuSimple's production have prejudiced Plaintiffs' ability to prepare an even more compelling preliminary injunction motion.  To wit, TuSimple (1) refused to produce any documents in the possession, custody, or control of "█████████████████████████████ █████████" on the purported basis that █████████████████████████ █████████████████████, (2) failed to produce any documents identifying the custodial locations of its trade secrets, and (3) improperly redacted documents

17

identifying the locations of TuSimple's trade secrets.  These deficiencies violated the terms of the TRO.  If TuSimple does not rectify these deficiencies, Plaintiffs should be entitled to adverse inferences that (1) Defendants have already transferred all TuSimple's U.S. trade secrets to China; and (2) TuSimple's U.S. trade secrets, once in China, were transferred to Hydron at Defendants' direction.[12]

First, on February 6, 2024, two weeks after the Court ordered discovery and *only three days* before Plaintiffs' preliminary injunction motion was due, TuSimple's counsel for the first time asserted that ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████  Third Chang Decl., Ex. 42 at 1.  Counsel further stated that "TuSimple was not permitted to inquire whether any documents responsive to the Order are in the possession, custody, or control of such subsidiaries."  *Id.*  At any point before its production was due, TuSimple could have disclosed these positions to Plaintiffs.  Instead, TuSimple chose to wait.  For the reasons articulated in Plaintiffs' motion for compliance with the TRO, counsel's representations are incorrect as a matter of law.  For present purposes, however, counsel's representations prejudiced Plaintiffs' preliminary injunction motion.[13]

---

[12] District Courts have inherent authority to shape appropriate sanctions due to discovery violations.  FED. R. CIV. P. 37(b)(2), (2)(a); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) ("Where … the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction."); *ExamWorks v. Todd Baldini*, 2020 WL 3127928, at *13 (E.D. Cal. June 11, 2020) (drawing adverse inferences where documents were produced "only a few days" before a hearing that deprived the plaintiff of an "opportunity to review"), *vacated in part on other grounds sub nom. ExamWorks, LLC v. Baldini*, 835 F. App'x 251 (9th Cir. 2020) (table).

[13] TuSimple was required to produce documents "sufficient to show the location of TuSimple's trade secrets" and those sufficient to show "any proprietary information and/or intellectual property belonging to TuSimple that has been disclosed or transferred to Hydron."  ECF No. 36 at 7.  By not even inquiring to TuSimple's China-based subsidiaries, TuSimple admits it has not (1) identified the location of TuSimple's trade secrets, which could be (and likely are) in the possession of TuSimple's China-based subsidiaries; or (2) identified what trade secrets, if any, were transferred from these China-based subsidiaries to Hydron.

Second, TuSimple's production fails to comply with its discovery obligations because it does not provide the custodial location of TuSimple's trade secrets.  For instance, TuSimple provided █████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████. *Id.*, Ex. 41. ████████████ █████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ *See id*. But ██████████ does not provide the actual, custodial locations of the trade secrets (*i.e.*, who possess them) — nor do any other documents TuSimple has produced.

Third, TuSimple has redacted information from its production without explanation.  TuSimple's counsel states that certain repositories were redacted where prohibited by relevant "licensing and services agreements." *Id.,* Ex. 42 at 2.  TuSimple also provided ████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████ *Id*.  This is at odds with the TRO, which allows for Plaintiffs to inspect the relevant documents on an attorneys' eyes-only basis and, therefore, is highly protective of any confidentiality concern TuSimple could legitimately have.  *See* ECF No. 36 at 7.  And again, TuSimple could have disclosed these issues to Plaintiffs at any point before the evening its document production was due.

At bottom, TuSimple made a series of strategic choices respecting its Court-ordered document production obligations.  Although Plaintiffs believe that discovery to date amply supports their preliminary injunction application, TuSimple's strategic choices have deprived Plaintiffs of the complete record to which they are entitled, violating the TRO.  If TuSimple does not rectify the deficiencies described above, Plaintiffs should be entitled to an adverse inference that Defendants have misappropriated TuSimple's trade secrets and that the Company's trade secrets continue to be at risk of further misappropriation.

## CONCLUSION

For the reasons set forth above, the Court should issue a preliminary injunction.

Dated: February 9, 2024

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)

_____
                s/ Albert Y. Chang
                Albert Y. Chang
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
fbottini@bottinilaw.com
achang@bottinilaw.com
aarnzen@bottinilaw.com

BERNSTEIN LITOWITZ BERGER &
    GROSSMANN LLP
Jeroen van Kwawegen
Thomas G. James (*pro hac vice*)
Eric J. Riedel (*pro hac vice*)
James Janison (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
jeroen@blbglaw.com
thomas.james@blbglaw.com
eric.riedel@blbglaw.com
james.janison@blbglaw.com

Gregory V. Varallo (*pro hac vice*)
500 Delaware Avenue, Suite 901
Wilmington, Delaware 19801
Telephone: (302) 364-3600
greg.varallo@blbglaw.com

*Attorneys for Plaintiffs*
*Norman Wilhoite and Judith Wilhoite*

20